CRAIG ANDERSON, Special Adm'r of the Estate of Catherine Anderson, Deceased, Plaintiff, v. ALBERTO-CULVER USA, INC., Defendant-Appellant (Aon Corporation, Defendant; The Village of Wheeling *et al.*, Defendants-Appellees).—THERESA P. WHITENER, as Independent Adm'r of the Estate of Robert Hampton Whitener, Deceased, Plaintiff, v. THE CITY OF PROSPECT HEIGHTS *et al.*, Defendants.—LAURA NEWCOMER, Plaintiff, v. THE VILLAGE OF WHEELING *et al.*, Defendants.—JACQUELINE QUERN, Independent Ex'r of the Estate of Arthur F. Quern, Deceased, Plaintiff-Appellant, v. THE VILLAGE OF WHEELING *et al.*, Defendants-Appellees.—KALYN ALWIN *et al.*, Co-Adm'rs of the Estate of Martin Larry Koppie, Deceased, Plaintiffs-Appellants, v. THE VILLAGE OF WHEELING *et al.*, Defendants-Appellees.

First District (4th Division)    Nos. 1—99—2166, 1—99—2256, 1—99—2387 cons.

Opinion filed December 7, 2000.—Rehearing denied January 10, 2001.

Adler, Murphy & McQuillen, of Chicago (John W. Adler, Michael G. McQuillen, and Paula LoMonaco, of counsel), for appellant Alberto-Culver USA, Inc.

Clifford Law Offices, of Chicago (Robert A. Clifford, Richard F. Burke, and Robert P. Sheridan, of counsel), for other appellants.

McCullough, Campbell & Lane, of Chicago (Ann P. Goodman and Joshua L. Prober, of counsel), and Dombroff & Gilmore, of New York, New York (Mark A. Dombroff, Raymond L. Mariani, and Dara L. Weiss, of counsel), for appellees.

PRESIDING JUSTICE HARTMAN delivered the opinion of the court:

A small private aircraft crashed at Palwaukee Municipal Airport (Palwaukee), killing all four people aboard. Plaintiffs, the estates of two pilots, one flight attendant and one passenger, filed wrongful death and survival actions, which were consolidated. Alberto-Culver USA, Inc. (Alberto-Culver), the registered owner of the airplane, was made a defendant, as were the Village of Wheeling, the City of Prospect Heights and Palwaukee Municipal Airport Commission (municipal defendants). Municipal defendants moved for and were granted summary judgment upon a claim of immunity under the Local Governmental and Governmental Employees Tort Immunity Act (745 ILCS 10/1—101 et seq. (West 1998) (Act)). Plaintiffs and Alberto-Culver appeal, raising as an issue whether the circuit court erred in granting the motion for summary judgment to municipal defendants, because plaintiffs can prove that municipal defendants failed to maintain the runway area in a reasonably safe condition, contrary to the requirements of section 3—102 of the Act (745 ILCS 10/3—102 (West 1998)) (section 3—102).

On October 30, 1996, a Gulfstream G-IV aircraft, registered to Alberto-Culver and piloted by Martin Larry Koppie and Robert Hampton Whitener, crashed while attempting its takeoff from runway 16/34 at Palwaukee. Two other people, Arthur F. Quern, a passenger, and Catherine Anderson, the flight attendant, were aboard the airplane at the time of the fatal accident. After the pilots had received clearance for takeoff, the airplane began to roll down the runway, but started to veer to the left side of the runway in the middle of its takeoff roll. According to the National Transportation Safety Board (NTSB), the aircraft rolled onto the grass off to the left side of the runway, traversing a shallow ditch that paralleled the runway, which resulted in the separation from the aircraft of landing gear, flight control surfaces and other airplane components. The ditch was about

$2^{1/2}$ feet deep at its deepest point and 20 feet wide. A 90-foot-wide spray of mud fanned out onto the runway parallel to where the airplane entered the ditch. The airplane then slid on its belly and became airborne after it encountered a small berm at the departure end of the runway. Once airborne, the airplane flew over Hintz Road, contacted the embankment along Wolf Road and skipped over Wolf Road. The aircraft then slid across a field and stream gully and came to rest on the edge of an apartment complex parking lot where it was consumed by flames.

Examination of the aircraft by the NTSB indicated no preexisting anomalies of the engines, flight controls or aircraft systems. The NTSB concluded that the drainage ditch paralleling runway 16/34 was a factor relating to the accident.

Municipal defendants purchased Palwaukee with federal and state funds on December 26, 1986. Palwaukee encompasses land located within both the Village of Wheeling and the City of Prospect Heights. Municipal defendants signed an intergovernmental agreement (Agreement) on February 26, 1985, providing for the joint acquisition, operation, maintenance and development of the airport. The Agreement also provided for the creation of an Airport Commission. Section 7 of the Agreement declared all activities of municipal defendants relating to Palwaukee, including the elimination of airport hazards, development, construction, improvement, maintenance and operation "to be public and governmental functions exercised for a public purpose, and are municipal functions."

Prior to December 1986, Palwaukee was privately owned and developed with private capital. By the mid-1980s, federal and state airport regulators perceived a risk that too many privately owned airports located in Chicago's northwest suburbs were being closed and developed for alternative uses. Because of Palwaukee's importance to regional air traffic demands, the Federal Aviation Administration (FAA) and the Illinois Department of Transportation (IDOT) requested that municipal defendants purchase the airport with federal and state funds.

Palwaukee originally did not serve scheduled air carriers. The FAA and IDOT at that time had not required Palwaukee to comply with airport design standards provided in the FAA Airport Design Advisory Circular (Advisory Circular). After municipal defendants purchased Palwaukee, however, the FAA required that certain aspects of the airport's design be modified to comply with FAA standards. Other than specific changes required by the FAA, municipal defendants were not obligated to make any other changes, although additional aspects of the airport design did not comply with the Advisory Circular. Mu-

nicipal defendants were not required to make other changes because Palwaukee still did not serve scheduled air carriers and, therefore, did not need to be certified under part 139 of the Federal Aviation Regulations.

Although no further changes were required, one of the purposes of acquiring Palwaukee was to use federal funds to plan and implement a program to improve the airport so that it could more efficiently and safely serve the region's air traffic needs. Municipal defendants engaged in detailed discussions with Palwaukee patrons, community leaders, IDOT and the FAA on how best to proceed with the improvements. As a result of these discussions, Palwaukee received federal and state funding to institute an airport layout plan (ALP). The ALP, dated September 2, 1992, depicted numerous development projects scheduled for improvement.

An airport seeking federal funds for an airport improvement project (AIP) must submit a project application requesting such funds and must include therewith a set of "Assurances," requiring the airport to comply with all applicable federal laws, regulations and guidelines, including advisory circulars issued by the FAA for AIP projects. The Assurances also prescribe that an airport "shall *be operated at all times in a safe and serviceable condition* and in accordance with the *minimum standards as may be required* or prescribed by *applicable Federal, state and local agencies* for maintenance and operation." (Emphasis added.)

Advisory Circular AC 150/5300—13 of February 24, 1992, sets forth guidelines for airport design, including surface grading requirements for runway shoulders and safety areas. A runway safety area (RSA) refers to an area surrounding a runway designed to enhance the safety of airplanes which undershoot, overrun or veer off the runway, and it provides greater accessibility for firefighting and rescue equipment during such incidents. The RSA must be capable, under normal (dry) conditions, of supporting airplanes without causing structural damage to the airplanes or injury to their occupants.

The Advisory Circular mandates that the RSA shall be:

"(1) cleared and graded and have no potentially hazardous ruts, humps, depressions, or other surface variations;

(2) drained by grading or storm sewers to prevent water accumulation;

(3) capable, under dry conditions, of supporting snow removal equipment, aircraft rescue and firefighting equipment, and the occasional passage of aircraft without causing structural damage to the aircraft; and

(4) free of objects, except for objects that need to be located in the RSA because of their function."

The Advisory Circular also states that drainage ditches may not be located within the safety area. Palwaukee admittedly does not comply with the standards for RSAs prescribed in the Advisory Circular.

Fred Stewart, Palwaukee's manager from December 1987 until the present, testified that on the date of the accident the RSA for runway 16/34 did not comply with FAA standards listed in the Advisory Circular. Stewart knew of the existence of a drainage ditch along the east side of the RSA prior to the date of the accident and described "depressions" in the ground along the western side of the RSA that served as drainage structures, conveying water runoff from the runway. According to Stewart, the drainage structure was located 25 feet from the left side of the runway and was 6 to 12 inches deep. Regular maintenance for the terrain alongside runway 16/34, which consisted of dirt and grass, was limited to mowing the grass and removal of dead animals.

Because the RSA did not comply with FAA standards and municipal defendants did not allocate funds to improve the RSA, municipal defendants sought waivers of compliance for certain safety areas and surfaces from the FAA and IDOT. On August 23, 1993, the FAA issued waivers for the RSA along runway 16/34 at Palwaukee based on the September 2, 1992, airport layout plan, which had requested them. The FAA waiver approval included the RSA widths and lengths for both runways 16 and 34, but did not include the surface areas of the RSA. IDOT waivers issued on December 3, 1993, also include the RSA widths and lengths for runways 16 and 34 but do not waive compliance with standards for surface areas.

Plaintiffs, the estates of victims of the accident, each filed separate wrongful death and survival actions against municipal defendants and Alberto-Culver. Plaintiffs amended their complaints to include counts for willful and wanton misconduct. A motion to consolidate all plaintiffs' cases was granted on February 17, 1998. Municipal defendants moved for summary judgment on April 16, 1998, asserting statutory immunity under the Act and claiming immunity from liability for discretionary decisions regarding the maintenance and operation of Palwaukee. Decisions regarding the RSAs were made by municipal defendants' employees who hold positions involving the determination of policy and the exercise of discretion. Municipal defendants contend they were under no legal mandate to take any specifically prescribed action regarding the RSAs because the FAA and IDOT were specifically aware of the RSAs' condition and did not require them to take any action to improve those areas. Because they engaged in discretionary acts and policy decisions concerning Palwaukee's RSAs, municipal defendants argue they are immune from tort liability under the Act.

Plaintiffs assert that a clear question of fact exists as to whether municipal defendants breached their statutory duty under section 3—102, which devolved upon a local public entity the duty to exercise ordinary care in the maintenance of its property. Plaintiffs contend that municipal defendants' actions were ministerial rather than discretionary and, as a result, municipal defendants are not protected by the Act.

The circuit court granted municipal defendants' motions for summary judgment on May 24, 1999, stating that there is at least a material fact question as to whether or not the drainage ditch contributed to the injury, noting that the drainage ditch did not comply with federal requirements. In granting the motion for summary judgment, the court analyzed the Act as applied to these facts, particularly section 3—102. The court concluded that the decision to repair the RSA was an improvement rather than mere maintenance, especially noting that municipal defendants consulted and discussed the issues with government agencies, which helped to prove municipal defendants engaged in policy discussions rather than maintenance of property. Plaintiffs and defendant Alberto-Culver appeal.

Plaintiffs and Alberto-Culver initially assert that the circuit court erred in granting summary judgment because the Act does not shield municipal defendants from liability under the facts of this case.

■ A reviewing court exercises *de novo* review when determining whether the circuit court properly granted a motion for summary judgment. *Zoeller v. Augustine*, 271 Ill. App. 3d 370, 374, 648 N.E.2d 939 (1995) (*Zoeller*); 735 ILCS 5/2—1005 (West 1998). Summary judgment is a "drastic means of disposing of litigation and therefore should be allowed only when the right of the moving party is clear and free from doubt." *Purtill v. Hess*, 111 Ill. 2d 229, 240, 489 N.E.2d 867 (1986). Summary judgment must be awarded with caution to avoid preempting a litigant's right to trial by jury or the right to fully present the factual basis of a case where a material dispute may exist. *Lamkin v. Towner*, 246 Ill. App. 3d 201, 204, 615 N.E.2d 1208 (1993). In determining a summary judgment motion, the pleadings, affidavits, depositions and admissions on file must be construed strictly against the moving party and liberally in favor of the opponent. *In re Estate of Hoover*, 155 Ill. 2d 402, 410-11, 615 N.E.2d 736 (1993). Reversal of a summary judgment motion is warranted where, on review, a material issue of fact or an inaccurate interpretation of the law exists. *Zoeller*, 271 Ill. App. 3d at 374.

■ In a cause of action alleging negligence, plaintiff must establish the existence of a duty, a breach of that duty and an injury proximately caused by the breach. *Parsons v. Carbondale Township*, 217 Ill. App.

3d 637, 643, 577 N.E.2d 779 (1991) (*Parsons*). The existence of duty is a question of law for the court to decide, the issues of breach and proximate cause are questions of fact for the jury, provided that there is a genuine issue of material fact regarding those issues. *Espinoza v. Elgin, Joliet & Eastern Ry. Co.*, 165 Ill. 2d 107, 114, 649 N.E.2d 1323 (1995). The relevant factors in determining whether to recognize a duty include the reasonable foreseeability of injury, the likelihood of such injury, the magnitude of guarding against that injury and the consequences of placing that burden on the defendant. *Jackson v. TLC Associates, Inc.*, 185 Ill. 2d 418, 425, 706 N.E.2d 460 (1998).

■ The Act governs the tort liability of a municipality. Municipal defendants contend that under section 2—109 (745 ILCS 10/2—109 (West 1998)) and section 2—201 (745 ILCS 10/2—201 (West 1998)) of the Act, plaintiffs' claims are barred by virtue of governmental immunity. *White v. Village of Homewood*, 285 Ill. App. 3d 496, 500, 673 N.E.2d 1092 (1996) (*White*). Section 2—201 provides:

"Except as otherwise provided by Statute, a public employee serving in a position involving the determination of policy or the exercise of discretion is not liable for an injury resulting from his act or omission in determining policy when acting in the exercise of such discretion even though abused." 745 ILCS 10/2—201 (West 1998).

Under section 2—109, a local public entity is not liable for an injury resulting from an act or omission of its employee where the employee is not liable. The policy of granting immunity to public officials rests on the proposition that public officials should be allowed to exercise their judgment without fear that a good-faith mistake might subject them to a lawsuit. *Midamerica Trust Co. v. Moffatt*, 158 Ill. App. 3d 372, 376, 511 N.E.2d 964 (1987).

■ Concerning public property, however, local governments have the traditional common law duty to maintain that property in a reasonably safe condition. *Curtis v. County of Cook*, 98 Ill. 2d 158, 163, 456 N.E.2d 116 (1983). Plaintiffs and Alberto-Culver allege that municipal defendants had a statutory duty to maintain the RSA in a reasonably safe condition under section 3—102, which provides:

"Except as otherwise provided in this Article, *a local public entity has the duty to exercise ordinary care to maintain its property in a reasonably safe condition for the use in the exercise of ordinary care of people whom the entity intended and permitted to use the property in a manner in which and at such times as it was reasonably foreseeable that it would be used,* and shall not be liable for injury unless it is proven that it has actual or constructive notice of the existence of such a condition that is not reasonably safe in reason-

ably adequate time prior to injury to have taken measures to remedy or protect against such condition." (Emphasis added.) 745 ILCS 10/3—102 (West 1998).

Plaintiffs and Alberto-Culver contend that municipal defendants' failure to comply with the statutory duty to maintain their property in a reasonably safe condition was a proximate cause of plaintiffs' decedents' injuries and damages.

The Act simply restates and codifies common law principles (*Wagner v. City of Chicago*, 166 Ill. 2d 144, 150, 651 N.E.2d 1120 (1995); *Santelli v. City of Chicago*, 222 Ill. App. 3d 862, 867, 584 N.E.2d 456 (1991)), and creates no new duties or liabilities for negligent acts or omissions which did not previously exist. *Horrell v. City of Chicago*, 145 Ill. App. 3d 428, 435, 495 N.E.2d 1259 (1986); *Hannon v. Counihan*, 54 Ill. App. 3d 509, 512, 369 N.E.2d 917 (1977).

The parties in the present case have cited no case law that applies governmental immunity to municipally owned airports nor case law that declines to apply the Act to municipally owned airports. The airport property here in question involves an RSA, part of a runway, which is analogous to a public right-of-way for public transportation purposes. Therefore, Illinois authorities examining municipal liability for other public rights-of-way, including highways and roads, are helpful.

Plaintiffs allege that municipal defendants failed to *maintain* the RSA in a reasonably safe condition as provided in section 3—102, in contrast to having failed to make an *improvement* to the RSA. A statutory provision concerned with public rights-of-way defines "maintain" and "maintenance" as "[t]he performance of all things necessary to keep a highway in serviceable condition for vehicular traffic." 605 ILCS 5/2—214 (West 1998). This definition is supported by the ordinary dictionary definition, that to maintain is "to keep in a state of repair, [or] efficiency." Webster's Third New International Dictionary 1362 (1993). "Improvement," on the other hand, is defined as a permanent addition to or betterment of real property that enhances its capital value; it involves the expenditure of labor or money and is designed to make the property more useful or valuable as distinguished from ordinary repairs. Webster's Third New International Dictionary 1138 (1993). To maintain property is considered a ministerial act; to improve property falls under the discretionary decision of the government entity. See *Koltes v. St. Charles Park District*, 293 Ill. App. 3d 171, 176, 687 N.E.2d 543 (1997);

*Kennell v. Clayton Township*, 239 Ill. App. 3d 634, 640-42, 606 N.E.2d 812 (1992).[1]

■ The determination of whether the questioned conduct is discretionary or ministerial must be determined on a case-by-case basis. *Snyder v. Curran Township*, 167 Ill. 2d 466, 474, 657 N.E.2d 988 (1995) (*Snyder*). The distinction between discretionary and ministerial functions resists precise formulation. *Snyder*, 167 Ill. 2d at 474; *Johnston v. City of East Moline*, 405 Ill. 460, 466, 91 N.E.2d 401 (1950); *Johnston v. City of Chicago*, 258 Ill. 494, 497, 101 N.E. 960 (1913).

Municipal defendants, citing *Harinek v. 161 North Clark Street Ltd. Partnership*, 181 Ill. 2d 335, 692 N.E.2d 1177 (1998) (*Harinek*), contend that they complied with the two immunizing requirements they must demonstrate, namely: (1) employees holding positions involving the determination of policy or the exercise of discretion must perform the alleged acts (*Harinek*, 181 Ill. 2d at 341) and, here, decisions regarding the RSA were made by the airport manager, his staff and an Airport Commission, with authority to reject or change the airport manager's decisions; and (2) the employee's act or omission was both a determination of policy and an exercise of discretion (*Harinek*, 181 Ill. 2d at 341) and, here, municipal defendants were under no legal mandate to take any specific action regarding the RSA. Municipal defendants claim, therefore, that their decisions, including their seeking waivers and not installing any improvements, were based

---

[1]Under the common law, municipalities had the discretion to determine whether to perform a public work or make an improvement. *Washington v. City of Chicago*, 188 Ill. 2d 235, 240, 720 N.E.2d 1030 (1999) (*Washington*). In *Snyder*, the court noted that "the common law recognized the distinction between discretionary duties, the negligent performance of which does not subject a municipality to tort liability, and ministerial duties, the negligent performance of which can subject a municipality to tort liability." *Snyder v. Curan Township*, 167 Ill. 2d 466, 473, 657 N.E.2d 988 (1995). Section 2—201 of the Act is a codification of this common law distinction. *Snyder*, 167 Ill. 2d at 473. Although "[d]iscretionary acts require the exercise of judgment and skill and can be characterized as governmental" in nature, in contrast, ministerial acts involve conduct performed in a prescribed manner and established method according to a given state of facts. *White*, 285 Ill. App. 3d at 503. Ministerial conduct occurs in compliance with a legal mandate and without any reference to an official's discretion regarding the appropriateness of the conduct. *Anderson v. Village of Forest Park*, 238 Ill. App. 3d 83, 94, 606 N.E.2d 205 (1992).

on the exercise of their discretion and represent a "balancing of interests" and a "judgment call."[2]

■ In order to recognize a duty, the reasonable foreseeability of injury, the likelihood of such injury, the magnitude of guarding against the injury and consequences of placing the burden on that defendant must be considered. *Washington*, 188 Ill. 2d at 239. In *Michalak v. County of La Salle*, 121 Ill. App. 3d 574, 576, 459 N.E.2d 1131 (1984) (*Michalak*), the court held that a duty may be owed to a motorist who deviates from the ordinary course of travel if such a deviation was reasonably foreseeable. Although in the case *sub judice* the record does not clearly indicate statistics noting the frequency of aircraft that deviate from the runway, the FAA requirement for airports to have an RSA concedes the foreseeability that airplanes would deviate from the ordinary course of travel in the direction of the RSA.

■ The duty of the municipal defendants to maintain a public airport in a reasonably safe condition, or the absence of such duty, is the ultimate issue in this case, not whether to make improvements to the RSA.[3] Municipal defendants were mandated by the FAA to comply with the Advisory Circular's standards concerning surface areas of an

---

[2]The Illinois Supreme Court has defined "policy decisions made by a municipality" as those decisions which require the municipality to balance competing interests and to make a judgment call as to what solution will best serve each of those interests. *Harinek*, 181 Ill. 2d at 342, citing *West v. Kirkham*, 147 Ill. 2d 1, 11, 588 N.E.2d 1104 (1992).

[3]Municipal defendants' reliance upon *County of Cook v. Priester*, 22 Ill. App. 3d 964, 318 N.E.2d 327 (1974), is misplaced. They assert they had no duty to improve Palwaukee because the FAA and IDOT have exclusive authority to promulgate rules and regulations for the configuration of airports. Municipal defendants contend that IDOT and the FAA approved the condition of the existing RSAs by waiving Palwaukee from compliance with the Advisory Circular. As previously noted, the waivers did not extend to surface conditions, such as were involved in the present case. Further, *Priester* involved an action to enforce provisions of a special use zoning permit issued by Cook County for Palwaukee. The issue on appeal was whether restrictions on the weight of an aircraft is an appropriate exercise of the state's police power. The appellate court concluded that such restrictions were beyond the power of the county to regulate; there was an absence of evidence showing a reasonable relationship between the restriction and public interests; and the effect of the weight restriction would manipulate the type and number of aircraft which the airport could service beyond the boundaries of the county under the guise of land use control, which could lead to chaotic results, among other reasons. 22 Ill. App. 3d at 969-70. None of the foregoing considerations apply here. The court noted that "[t]he policy of the State of Illinois is to encourage air travel development 'with the least possible restriction, consistent with their safety

RSA. The FAA and IDOT waivers granted to them did not exempt municipal defendants from complying with surface standards for the RSA. The waivers only stated clearance for width and length standards of the RSA for runway 16/34.

In this case, there was evidence showing that the RSA for runway 16/34 had drainage ditches with a soft mud consistency incapable of supporting the aircraft that crashed, causing it to lose its landing gear shortly after traversing those ditches. This issue should have been decided by a fact finder, not a motion court.

The foregoing conclusion is supported by case law. In *Snyder*, the Illinois Supreme Court held that discretionary immunity did not insulate the defendant township from liability for the improper location of a road sign. *Snyder*, 167 Ill. 2d at 472, 477. The supreme court found that, in light of the applicable regulations and statutes, the issue of compliance or noncompliance with the Illinois Manual on Uniform Traffic Control Devices was a fact question. *Snyder*, 167 Ill. 2d at 472. Section 11—304 of the Illinois Vehicle Code (625 ILCS 5/11—304 (West 1992)), by mandating compliance with the manual, established defendant's duty of reasonable care. Whether that duty was breached was found to be a jury question, based upon an examination of the applicable provisions of the manual and the facts of the case. *Snyder*, 167 Ill. 2d at 472. The court further reasoned:

> "To countenance defendant's interpretation of the statutes and regulations would require this court to hold that a government official complies with section 11—304 of the Vehicle Code even if that official ignores the Illinois Manual and places a traffic control device upside down, behind a tree, or anywhere else he chooses. Such a holding would render both section 11—304 of the Vehicle Code and the regulations within the Illinois Manual virtually meaningless." *Snyder*, 167 Ill. 2d at 472.

Finally, the court held that the duties of defendant were properly characterized as ministerial because tailored statutory and regulatory guidelines place certain constraints on the decisions of officials and a court should be reluctant to label decisions falling wholly outside the established parameters as "discretionary." *Snyder*, 167 Ill. 2d at 474.

In the instant case, the Advisory Circular provided regulatory guidelines for RSA surface standards which municipal defendants were required to follow after the FAA and IDOT provided approval

---

and with the safety and the rights of others.' " *Priester*, 22 Ill. App. 3d at 968, quoting Ill. Rev. Stat. 1971, ch. 15½, par. 22.25. The court held that the weight restriction would discourage aviation technology from improving the capability of aircraft and inhibit full utilization of airport facilities. *Priester*, 22 Ill. App. 3d at 969.

and funding for Palwaukee. Accepting federal and state funding mandated municipal defendants' compliance with the Advisory Circular surface safety standards and established their duty of reasonable care.

Although municipal defendants actively sought and received waivers to exempt them from improving conditions in the RSA while accepting federal and state funding to institute improvements via the airport layout plan, as previously noted, those waivers did not extend to the surface conditions of the RSA. As with the supreme court in *Snyder*, we cannot conclude that municipal defendants should be allowed to maintain runways or runway shoulders in an unsafe condition, any more than they could operate the airport runways with chuckholes, potholes or mires just because they found the airport in such condition when they took over its operation. Their admitted disregard for such conditions perpetuated a hazardous condition for aircraft taking off and landing at Palwaukee. Municipal defendants knew the condition of the RSA for runway 16/34 was substandard at the time they purchased Palwaukee in 1986. The airport manager, Fred Stewart, testified that the RSA did not comply with FAA standards on the date of the crash, October 30, 1996. The crash occurred almost three years after federal and state approval of municipal defendant's ALP for Palwaukee. During that time, municipal defendants continued their limited maintenance of the RSA by mowing the lawn and removing dead animals and admitted they took no other action to ameliorate the hazardous condition of the RSA.

Municipal defendants argue that to maintain the RSA safely would require an improvement and cost an inordinate amount of money, which they lacked, and that the decision not to take measures to eliminate the hazards of the RSA involved numerous complex factors. The record contains no estimate of the cost to ameliorate hazardous conditions, such as the drainage ditches located to the west of the runway in which the evidence supports the thesis that the plane lost its landing gear as a result of traversing the ditch. Nor are complex factors identified in the record.

In *Baran v. City of Chicago*, 43 Ill. 2d 177, 180-81, 251 N.E.2d 227 (1969), the supreme court stated:

"In holding a city responsible for injuries thus caused[,] the court is not reviewing the city's discretion in selecting a plan. It is not controlling or passing upon the city's estimate of public needs. Nor is it deciding what the 'best' kind of improvement may be. *** *A municipal corporation, like an individual or a private corporation, is required to exercise its rights and powers with such precautions as shall not subject others to injury.* The rule which protects it in

the exercise of its governmental functions should not be construed to relieve [it] from liability when the plan devised, if put in operation, leaves the city's streets in a dangerous condition for public use." (Emphasis added.)

In the present case, plaintiffs may very well succeed in demonstrating that municipal defendants failed to use ordinary care in maintaining the RSA in a reasonably safe condition. Every failure to maintain property could be described as an exercise of discretion under municipal defendants' expansive approach to governmental immunity. The legislature could not have intended such a result; otherwise, it would not have codified the common law duty to maintain property under section 3—102 of the Act. The Act must be strictly construed against the public entity involved. *Aikens v. Morris*, 145 Ill. 2d 273, 278, 583 N.E.2d 487 (1991).

Accordingly, summary judgment may not be entered where there is a material fact question of whether public property was maintained in conformity with applicable safety standards; the cause must be reversed and remanded for trial for this determination.

Reversed and remanded.

HOFFMAN and SOUTH, JJ., concur.