LYNNE K. JACKSON, Personal Representative of the Estate of Curtis W. Jackson, Deceased, Plaintiff-Appellant, v. DAVID L. GRAHAM, Defendant-Appellee.

Fourth District   No. 4—00—0826

Opinion filed July 13, 2001.

Stephen L. Williams (argued), of Mann Law Firm, of Terre Haute, Indiana, for appellant.

Karen L. Kendall (argued), of Heyl, Royster, Voelker & Allen, P.C., of Peoria, and Edward M. Wagner, of Heyl, Royster, Voelker & Allen, P.C., of Urbana, for appellee.

PRESIDING JUSTICE STEIGMANN delivered the opinion of the court:

In December 1997, plaintiff, Lynne K. Jackson (Jackson), personal

representative of the estate of Curtis W. Jackson (Curtis), filed an amended complaint against defendant, David L. Graham, M.D., for medical malpractice, alleging that Graham failed to diagnose and treat Curtis' deep vein thrombophlebitis and thrombosis. In November 1999, Graham filed a motion for summary judgment. In December 1999, Jackson filed a response to that motion, attaching the affidavits of two physicians. In January 2000, Graham filed a motion to strike those affidavits, and in August 2000, the trial court granted Graham's motion to strike as well as his motion for summary judgment.

Jackson appeals, arguing that the trial court erred by (1) striking the affidavits and (2) granting Graham's motion for summary judgment. We reverse and remand for further proceedings.

## I. BACKGROUND

The following facts appear from the complaint, affidavits, attached documents, and depositions. On July 19, 1995, Jackson brought her husband, Curtis, to Carle Clinic in Urbana, to see Graham, who was Curtis' primary care physician and was board certified in internal medicine. Curtis told Graham that his right calf was swollen and had been painful for a couple of days. In addition, Jackson asked Graham to check Curtis' ears because she thought he might have an ear infection. Graham examined Curtis' leg and noted on Curtis' medical chart that (1) Curtis' right calf was larger than his left calf, (2) Curtis was experiencing some tenderness in his right calf, and (3) his "gait and ambulation" were different than usual. Graham then sent Curtis for an ultrasound doppler test on his right leg.

Later on July 19, 1995, Dr. Robert Twohey, a cardiologist, read the ultrasound test results as showing "[n]o evidence of deep or superficial venous thrombosis" and "no ancillary soft[-]tissue pathology." Graham did not schedule Curtis for a follow-up appointment, leaving further evaluation of Curtis' calf to Dr. Kenneth S. Aronson, who was then treating Curtis for a seizure disorder. (Curtis had an August 3, 1995, appointment scheduled with Aronson.) Graham also diagnosed Curtis as having otitis media (inflammation of the middle ear) and prescribed an antibiotic.

On July 26, 1995, Jackson called Aronson's office because Curtis' symptoms worsened. At around 6 a.m. the next day, Curtis was taken by ambulance to the emergency room at Union Hospital in Terre Haute, Indiana. He died about an hour later. Later that day, Dr. Roland Kohr conducted an autopsy, which showed the following: (1) Curtis had a large saddle embolus in his pulmonary artery and additional thrombi within his inferior vena cava; and (2) the cause of his death was "acute pulmonary embolization."

In December 1997, Jackson filed an amended complaint against Graham, alleging that Graham was negligent in that he (1) failed to diagnose and treat the deep vein thrombophlebitis and thrombosis in Curtis' inferior vena cava and lower right leg, (2) misdiagnosed Curtis' medical condition as otitis media, (3) failed to properly monitor Curtis' medical condition, (4) failed to conduct or order proper diagnostic tests, (5) failed to provide an appropriate follow-up evaluation of Curtis, and (6) failed to provide any diagnosis and treatment of the medical condition Curtis complained of on July 19, 1995.

In November 1999, Graham filed a motion for summary judgment, arguing that Jackson could not establish medical negligence or proximate cause. Graham attached to the summary judgment motion his own affidavit, in which he averred as follows: (1) he is a physician licensed in Illinois; (2) he had reviewed his notes and medical records regarding Curtis; and (3) based on his experience, examination, and testing of Curtis on July 19, 1995, as well as his review of the notes and medical records pertaining to Curtis, (a) his care and treatment of . Curtis were appropriate and within the standard of care, and (b) on July 19, 1995, no evidence existed that Curtis had deep vein thrombosis or thrombophlebitis. Graham also attached Kohr's affidavit, in which Kohr averred that, without speculating, he could not determine when the saddle embolus had developed.

In December 1999, Jackson filed a response to Graham's summary judgment motion, attaching the affidavits of two physicians, John T. Philbrick, M.D., and W. Welby Cox, M.D. In his affidavit, Philbrick averred, in pertinent part, as follows: (1) if called as a witness in the case, he could competently testify to the matters set forth in his affidavit; (2) he received his medical degree from Harvard Medical School; (3) he was a licensed physician in Virginia, was board certified in internal medicine, and devoted 60% of his internal medicine practice to treating patients; (3) since 1980, he had taught and supervised University of Virginia medical students and residents in the practice of internal medicine and treatment of patients (Philbrick also attached his curriculum vitae to his affidavit); (4) "the examination, diagnosis, care[,] and treatment of patients with a history and symptoms similar to [Curtis] when treated by [Graham] is a national standard for [b]oard[-][c]ertified [i]nternal [m]edicine physicians, such as [Graham]"; (5) he was "familiar with the standard of care exercised by [b]oard[-][c]ertified [i]nternal [m]edicine [p]hysicians practicing in private physicians groups of more than 300 physicians in clinics in cities the size of Champaign-Urbana, Illinois, with populations of approximately 100,000, and Champaign County, Illinois, with populations of approximately 170,000, or in similar communities," during

July 1995, when Graham treated Curtis; (6) he had reviewed medical records and other materials related to Curtis' treatment, including Curtis' medical records from Carle Clinic, the ultrasound test report, and the autopsy report; and (7) in Philbrick's opinion, to a reasonable degree of medical certainty, Graham's treatment and care of Curtis were "below, and did not conform with, the appropriate standard of care, and caused [Curtis'] death."

In his affidavit, Philbrick also set forth the specific ways in which Graham's care and treatment of Curtis fell below the appropriate standard of care, as follows: (a) on July 19, 1995, Curtis, who was at an increased risk for deep vein thrombosis due to his obesity, showed signs and symptoms consistent with deep vein thrombosis in his lower right leg; (b) in 1995, the minimum standard of care for patients like Curtis required that the treating physician reevaluate the patient "within several days of initial presentation," and Graham had failed to conduct a timely follow-up of Curtis; (c) in 1995, the minimum standard of care included instructing the patient that if his symptoms worsened or if he experienced symptoms of pulmonary embolism, he should seek immediate medical attention, and Graham failed to properly instruct Curtis regarding when to seek medical attention; and (d) Graham's failure to diagnose and treat Curtis' thromboembolism resulted in Curtis' death.

Philbrick's affidavit also set forth the following particular facts upon which his opinions were based: (1) Curtis was 39 years old and suffered from a seizure disorder and obesity; (2) during his July 19, 1995, appointment with Graham, Curtis complained of swelling and pain in his right calf, which had been present for several days; (3) Curtis had no history of similar complaints; (4) Graham's examination of Curtis revealed that Curtis' right calf was swollen and tender; (5) Curtis was at "increased risk for deep venous thrombosis due to his obesity"; (6) on July 19, 1995, Curtis showed signs and symptoms consistent with deep vein thrombosis of his right lower leg; (7) Graham scheduled an ultrasound test of Curtis' right calf but did not schedule a follow-up appointment for Curtis; (8) because an ultrasound of a patient's lower extremity "is limited in its ability to visualize deep veins of the calf," a negative ultrasound does not rule out deep vein thrombosis; (9) a "significant portion of calf[-]deep venous thrombosis (approximately 20%) extend to the thigh during the 10 to 14 days following presentation of a patient with this problem to a physician for evaluation"; and (10) once a thrombosis is in the deep veins of the thigh, a significant risk (approximately 50%) exists that it will embolize to the lungs.

In his affidavit, Cox averred, in pertinent part, as follows: (1) if

called as a witness in the case, he could competently testify to the matters set forth in his affidavit; (2) he received his medical degree from the University of Missouri Medical School and completed both his internship and residency in internal medicine; (3) he was a licensed physician in Missouri and Washington and was board certified in internal medicine; (4) he was currently in private practice in Everett, Washington, and from 1995 until 1999, he specialized in internal medicine at the Springfield Clinic Cancer and Hematology Center in Springfield, Missouri (Cox also attached his curriculum vitae to his affidavit); (5) "the examination, diagnosis, care[,] and treatment of patients with a history and symptoms similar to [Curtis] when treated by [Graham] is a national standard for [b]oard[-][c]ertified [i]nternal [m]edicine physicians, such as [Graham]"; (6) he was "familiar with the standard of care exercised by [b]oard[-][c]ertified [i]nternal [m]edicine [p]hysicians practicing in private physicians groups of more than 300 physicians in clinics in cities the size of Champaign-Urbana, Illinois, with populations of approximately 100,000, and Champaign County, Illinois, with populations of approximately 170,000, or in similar communities," during July 1995, when Graham treated Curtis; (7) he had reviewed medical records and other materials related to Curtis' treatment, including Curtis' medical records from Carle Clinic, the ultrasound test report, and the autopsy report; and (8) in Cox's opinion, to a reasonable degree of medical certainty, Graham's treatment and care of Curtis were "below and did not conform with, the appropriate standard of care, and caused [Curtis'] death."

Cox's affidavit also set forth the specific ways in which Graham's care and treatment of Curtis fell below the appropriate standard of care, as follows: (a) when Graham examined Curtis on July 19, 1995, Curtis had a deep vein thrombophlebitis and thrombosis in his lower right leg; (b) Graham deviated from the appropriate standard of care by failing to conduct an appropriate follow-up evaluation of Curtis; and (c) on July 19, 1995, Graham failed to fully address Curtis' chief complaint of a swollen right calf.

Cox's affidavit also set forth the following particular facts upon which his opinions were based: (1) Curtis was a 39-year-old man who had been monitored by Carle Clinic physicians for several years; (2) Curtis suffered from a convulsive disorder, which was caused by a previous head injury; (3) prior to his death, Curtis "had experienced some difficulty with breakthrough seizures and changes in his anti-convulsant program became necessary"; (4) during his July 19, 1995, appointment with Graham, Curtis complained of swelling and pain in his right calf; (5) Curtis' medical chart indicated that Curtis and Jackson had noticed the swelling for a "couple of days"; however, the

chart also indicated that Jackson thought that Curtis' right lower leg had been swollen "for a number of weeks"; (6) Graham's examination of Curtis revealed that Curtis' right calf was swollen and tender; (7) Graham scheduled an ultrasound test of Curtis' right calf but did not schedule a follow-up appointment for Curtis and instead left further evaluation to Aronson; (8) because the swelling and pain in Curtis' right leg had not improved, Graham should have ordered another ultrasound test; and (10) a repeat ultrasound test "probably would have shown the development of a diagnosable deep venous thrombo-ph[ ]lebitis and thrombosis in the inferior vena cava and more importantly in the right lower extremity."

In January 2000, Graham filed a motion to strike Cox's and Philbrick's affidavits, claiming that they were insufficient under Supreme Court Rule 191(a) (145 Ill. 2d R. 191(a)). In April 2000, the trial court conducted a hearing on all pending motions and took the matter under advisement.

In August 2000, the trial court entered a written order granting both Graham's motion to strike the physicians' affidavits and his motion for summary judgment. In striking Cox's and Philbrick's affidavits, the court found as follows: (1) Cox's and Philbrick's averments that a national standard of care governs the conduct of board-certified internal medicine physicians when they examine, diagnose, care for, and treat patients with a history and symptoms similar to Curtis' "fail[ ] to identify the source of any such standard. Such assertion amounts to an unsupported conclusion, would not be competent testimony at trial, and therefore, does not meet the requirements of *** Rule 191(a)"; (2) Cox's and Philbrick's averments that they were familiar with the standard of care in clinics such as Carle Clinic, which are located in cities the same size as Champaign-Urbana, or in similar communities, were "unsupported by any foundational facts which would identify affiant's source of knowledge as to the standard of care described, would not be competent testimony at trial, and therefore, do[ ] not meet the requirements of Supreme Court Rule 191(a)"; and (3) "[i]n the absence of any foundational facts establishing the standard of care governing the interaction between [Curtis] and [Graham], which is necessary to establish the duty owed by [Graham], any testimony by [Cox or Philbrick] at trial in regard to acts or omissions of [Graham] that would constitute a breach of any such duty would be incompetent."

In granting Graham's motion for summary judgment, the trial court stated, in pertinent part, as follows:

> "After reviewing the pleadings, depositions[,] and admissions on file and the affidavit of [Graham], the [c]ourt has determined there

is no triable issue of fact as [to] any breach of the duty owed by [Graham] to [Curtis] as his treating physician and that [Graham] is entitled, as a matter of law, to entry of judgment in his favor on the issue of liability. The [c]ourt specifically finds that, absent the affidavits of [Cox and Philbrick], which have been ordered stricken, there is no evidence to contravene the verified statement in [Graham's] affidavit and testimony in his deposition that his care, treatment, testing, diagnosis[,] and instructions rendered for and to [Curtis] were appropriate, proper, and within the standard of care."

This appeal followed.

## II. ANALYSIS

### A. Motion To Strike the Affidavits of Philbrick and Cox

#### 1. *Standard of Review*

Initially, Graham contends that the trial court's decision to grant or deny a motion to strike a Rule 191 affidavit filed in support of, or in opposition to, a summary judgment motion is a matter of discretion, and this court should not reverse the trial court's decision absent an abuse of that discretion. We disagree.

•1 In support of his argument for an abuse of discretion standard of review, Graham cites *In re Estate of Hoover*, 155 Ill. 2d 402, 420, 615 N.E.2d 736, 744 (1993), for the proposition that a trial court's decision to strike an affidavit is an evidentiary matter and thus within that court's discretion. We agree that generally an abuse of discretion standard of review applies when this court reviews a trial court's evidentiary rulings. See, *e.g., Poulos v. Lutheran Social Services of Illinois, Inc.*, 312 Ill. App. 3d 731, 745, 728 N.E.2d 547, 559 (2000). However, in this case, we are reviewing the trial court's ruling on a motion to strike an affidavit, which motion was made in conjunction with the court's ruling on a motion for summary judgment. In such cases, the appropriate standard of review is *de novo*.

In *Employers Insurance v. Ehlco Liquidating Trust*, 186 Ill. 2d 127, 160, 708 N.E.2d 1122, 1139 (1999), the supreme court addressed an analogous situation and held that when the trial court awards attorney fees and costs (a decision generally reviewed under an abuse of discretion standard) in conjunction with that court's ruling on a motion for judgment on the pleadings, the reviewing court must apply the standard of review that is appropriate for a grant of judgment on the pleadings—that is, the *de novo* standard of review. See also *Mobil Oil Corp. v. Maryland Casualty Co.,* 288 Ill. App. 3d 743, 751-55, 681 N.E.2d 552, 558 (1997) (applying *de novo* standard of review to an award of attorney fees and costs made in a grant of summary judg-

ment; cited approvingly by the supreme court in *Employer's Insurance*). Accordingly, when the trial court rules on a motion to strike a Rule 191 affidavit in conjunction with a summary judgment motion, we review *de novo* the trial court's ruling on the motion to strike.

Applying a *de novo* standard of review in such situations is logical, as the following hypothetical illustrates. Assume that the trial court had before it this same case, with the same affidavits, but that the defendant had not filed a motion to strike those affidavits. In such a case, the court could have—and should have—engaged in the same analysis as it did here. In other words, the court did not need to have before it a motion to strike in order to find that the affidavits were insufficient under Rule 191(a) (145 Ill. 2d R. 191(a)). Under that circumstance, the appropriate standard of review clearly would be *de novo*. See *Ferguson v. McKenzie*, 202 Ill. 2d 304, 308 (2001); *Jones v. Chicago HMO Ltd.*, 191 Ill. 2d 278, 291, 730 N.E.2d 1119, 1127 (2000); *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill. 2d 90, 102, 607 N.E.2d 1204, 1209 (1992) (in which the supreme court held for the first time that reviewing courts should conduct *de novo* reviews of summary judgment rulings); *Carroll v. Paddock*, 317 Ill. App. 3d 985, 990, 741 N.E.2d 326, 330 (2000); *Kipnis v. Mandel Metals, Inc.*, 318 Ill. App. 3d 498, 503, 741 N.E.2d 1033, 1037 (2000); *Anderson v. Alberto-Culver USA, Inc.*, 317 Ill. App. 3d 1104, 1110, 740 N.E.2d 819, 824-25 (2000); *People v. Select Specialties, Ltd.*, 317 Ill. App. 3d 538, 542, 740 N.E.2d 543, 547 (2000).

Likewise, in this case, the trial court did not need Graham's motion to strike in order to consider the sufficiency of Cox's and Philbrick's affidavits. It simply would make no sense to conclude that the otherwise applicable standard of review—*de novo*—can be changed to a deferential standard by a party's unilateral decision to file a wholly unnecessary motion to strike the affidavits. Accordingly, we review *de novo* the trial court's ruling on Graham's motion to strike the affidavits filed in opposition to his summary judgment motion.

In so holding, we note that *Hoover*, 155 Ill. 2d 402, 615 N.E.2d 736, does not require a different result. Although the *Hoover* court reviewed the trial court's striking of an affidavit in that case under an abuse of discretion standard, it did not directly address the proper standard of review to be applied when the trial court rules on a motion to strike in conjunction with a motion for summary judgment. See *Hoover*, 155 Ill. 2d at 419, 615 N.E.2d at 744. Moreover, *Hoover* was decided several years before the supreme court decided *Employer's Insurance*.

## 2. The Trial Court's Grant of Graham's Motion To Strike Cox's and Philbrick's Affidavits

Jackson first argues that the trial court erred by granting Graham's motion to strike Cox's and Philbrick's affidavits because the affidavits were sufficient under Rule 191(a). We agree.

### a. National Standard of Care

●2 In determining the appropriate standard of care, Illinois still follows the "similar locality" rule, "which requires physicians to possess and apply the knowledge, skill[,] and care which a reasonably well-qualified physician in the same or similar community would bring to a similar case." *Slezak v. Girzadas*, 167 Ill. App. 3d 1045, 1052, 522 N.E.2d 132, 135 (1988). In *Purtill v. Hess*, 111 Ill. 2d 229, 246, 489 N.E.2d 867, 874 (1986), the supreme court recognized that because "there are today relatively uniform standards for the education and licensing of physicians," courts should read the "similar locality" rule broadly. The issue in *Purtill* was whether a physician's affidavit filed in opposition to the defendant's summary judgment motion demonstrated the affiant's familiarity with the applicable standard of medical care. *Purtill*, 111 Ill. 2d at 243, 489 N.E.2d at 873. In his affidavit, the physician admitted a lack of knowledge regarding the standard of care applicable to physicians in the same community or similar communities in which the defendant practiced medicine. *Purtill*, 111 Ill. 2d at 244, 489 N.E.2d at 873. The trial court struck the affidavit and granted summary judgment in the defendant's favor, and the appellate court later affirmed that decision. *Purtill*, 111 Ill. 2d at 239, 489 N.E.2d at 871.

On appeal to the supreme court, the plaintiff urged the court to reconsider the "similar locality" rule. *Purtill*, 111 Ill. 2d at 246, 489 N.E.2d at 874. Although the supreme court refused to abolish that rule, it reversed the trial and appellate courts, holding that an expert need not be familiar with the standard of medical care in a particular community when a nationally uniform, minimum standard exists and the expert is familiar with that standard. *Purtill*, 111 Ill. 2d at 247, 489 N.E.2d at 874-75. Thus, the *Purtill* court held that an expert will be qualified to testify as to the standard of care in a medical malpractice case if (1) the expert is familiar with the standards of care applicable to a reasonably well-qualified physician in the same or similar locality of treatment *or* (2) certain nationally uniform, minimum standards exist despite the locality of treatment, and the expert is familiar with those standards. *Purtill*, 111 Ill. 2d at 246-47, 489 N.E.2d at 874-75. The *Purtill* court further held that only if *"conditions and facilities that are available* [to the defendant physician] *are relevant"* must

the expert be "acquainted with accepted standards of care under similar circumstances." (Emphasis added.) *Purtill*, 111 Ill. 2d at 247, 489 N.E.2d at 875. Accordingly, a party may invoke the "similar locality" rule *only* when a question exists regarding the inequality of medical facilities and conditions, such as the availability of facilities for examination and treatment of the patient or the presence of a specialist, which would make it unfair to hold a physician practicing in a small, rural community to the same standard of care as a physician practicing in an urban environment where specialized care facilities are readily available.

•3 In this case, no question exists regarding the availability or inequality of medical facilities. In *Cassady v. Hendrickson*, 138 Ill. App. 3d 925, 936, 486 N.E.2d 1329, 1336 (1985), this court rejected the "similar locality" rule as it pertains to board-certified specialists at Carle Clinic, stating, in pertinent part, as follows:

> "[Carle] Clinic is a nationally recognized medical group practice. In order to achieve this recognition, it had to be nationally qualified, have facilities approved by a national review group, and have nationally qualified personnel. It is affiliated with a medical school and is an urban unit. Most of its physicians are board certified. ***
>
> *** Maintaining that a nationally recognized, urban, physicians' association with access to current medical technology should benefit from the protection the same or similar community standard affords the rural practitioner disregards the purpose and rationale behind the locality rule."

In light of (1) Carle Clinic's status as a nationally recognized, urban medical group that is affiliated with a medical school and (2) the fact that no dispute exists over whether Carle Clinic has the necessary equipment to diagnose and treat deep vein thrombosis, the "similar locality" rule does not apply to this case.

Graham does not contend that Carle Clinic should not be held to a national standard of medical care because it has inferior facilities, equipment, or physicians. Indeed, such a contention would be disingenuous. Instead, he claims that "there cannot be a national standard of care because [Jackson's] experts disagree" on that standard of care. Contrary to Graham's claim, Cox's and Philbrick's affidavits do not show that they disagree on the national standard of medical care. Rather, both Cox and Philbrick averred that the national standard of care requires physicians to conduct an adequate and timely follow-up of the patient, which includes conducting a repeat ultrasound doppler test. Cox's and Philbrick's affidavits differed only in that Cox averred that Graham should have hospitalized Curtis for further observation and evaluation prior to conducting another ultrasound

doppler test and Philbrick did not. Cox and Philbrick both agreed that the minimum national standard of care required a follow-up ultrasound test.

Having determined that a national standard of medical care applies in this case, we must next determine whether Cox's and Philbrick's affidavits were sufficient under Rule 191(a) (145 Ill. 2d R. 191(a)).

### b. Rule 191(a)

Jackson contends that Cox's and Philbrick's affidavits satisfied Rule 191(a) and the trial court erred when it found that the affidavits were insufficient because they failed to identify the "source" of the national standard. We agree.

•4 Supreme Court Rule 191(a) governs the sufficiency of an affidavit filed in support of, or in opposition to, a motion for summary judgment (145 Ill. 2d R. 191(a)). That rule provides, in pertinent part, as follows:

> "Affidavits in support of and in opposition to a motion for summary judgment *** shall be made on the personal knowledge of the affiants; shall set forth with particularity the facts upon which the claim, counterclaim, or defense is based; shall have attached thereto sworn or certified copies of all papers upon which the affiant relies; shall not consist of conclusions but of facts admissible in evidence; and shall affirmatively show that the affiant, if sworn as a witness, can testify competently thereto." 145 Ill. 2d R. 191(a).

Rule 191(a) is satisfied if "from the document as a whole, it appears the affidavit is based on the personal knowledge of the affiant and there is a reasonable inference that the affiant could competently testify to its contents at trial." *Kugler v. Southmark Realty Partners III*, 309 Ill. App. 3d 790, 795, 723 N.E.2d 710, 714 (1999).

•5 In *Woolums v. Huss*, 323 Ill. App. 3d 628 (2001) (Steigmann, P.J., specially concurring), Presiding Justice Steigmann recently questioned the requirements of Rule 191(a) as it pertains to expert opinions and called on the supreme court to address the rule in light of the supreme court's holding in *Wilson v. Clark*, 84 Ill. 2d 186, 417 N.E.2d 1322 (1981). However, even leaving aside the concerns expressed in that special concurrence, we conclude that Cox's and Philbrick's affidavits satisfied the requirements of Rule 191(a).

Philbrick's affidavit shows that he (1) has been a board-certified internal medicine physician since 1978, (2) has completed extensive education and training in the field of internal medicine, and (3) has several years of experience in that field. Philbrick also averred that since 1980, he has taught at the University of Virginia School of Medicine, and since 1997, he has taught and supervised University of

Virginia medical students and residents in the practice of internal medicine. In addition, Philbrick's curriculum vitae shows that he has written several articles regarding the diagnosis and management of deep vein thrombosis.

Cox's affidavit shows that he (1) has been a board-certified internal medicine physician since 1975, (2) has completed extensive education and training in the field of internal medicine, and (3) has several years of experience in that field. In addition, Cox's affidavit shows that he completed both his internship and medical residency in internal medicine.

Viewing Cox's and Philbrick's affidavits as a whole (including their attached curriculum vitae), we conclude that the facts stated therein support a reasonable inference that the source of the national standard of medical care is the education and training they have received in the field of internal medicine. If the nationally uniform standard of medical care is the norm, which it is, then it is axiomatic that the source of that standard is the medical education and training that physicians receive. See *Purtill*, 111 Ill. 2d at 246, 489 N.E.2d at 874 (in which the supreme court recognized that "there are today relatively uniform standards for the education and licensing of physicians"). We thus further conclude that viewing the affidavits as a whole, Cox and Philbrick could competently testify to the contents of their respective affidavits at trial. Accordingly, we hold that the trial court erred by granting Graham's motion to strike Cox's and Philbrick's affidavits. See *Williams v. Covenant Medical Center*, 316 Ill. App. 3d 682, 693, 737 N.E.2d 662, 672 (2000) (in which this court concluded that the affidavit of the plaintiff's expert satisfied Rule 191(a), noting that the expert (1) averred that he reviewed the patient's medical records and available depositions, (2) described the patient's conditions that increased her risk of falling, and (3) stated that the hospital's nursing staff failed to raise all of the patient's bed rails and the patient suffered injuries after leaving her bed and falling).

Moreover, even if an abuse of discretion standard of review applied, we would hold that the trial court abused its discretion by striking Cox's and Philbrick's affidavits.

### B. Motion for Summary Judgment

Last, Jackson argues that the trial court erred by granting Graham's motion for summary judgment. We agree.

●6 Summary judgment is appropriate when the pleadings, affidavits, depositions, admissions, and exhibits on file, when viewed in the light most favorable to the nonmoving party and strictly against

the moving party, reveal that (1) no genuine issue of material fact exists and (2) the moving party is entitled to judgment as a matter of law. *Jones*, 191 Ill. 2d at 291, 730 N.E.2d at 1127; *Purtill*, 111 Ill. 2d at 250, 489 N.E.2d at 876. Thus, in the context of a medical malpractice action, summary judgment is proper "only where the plaintiff has failed to demonstrate an ability to offer, through competent expert testimony, evidence at trial on the applicable standard of medical care." *Purtill*, 111 Ill. 2d at 250, 489 N.E.2d at 876; see *Smock v. Hale*, 197 Ill. App. 3d 732, 741, 555 N.E.2d 74, 80 (1990). Summary judgment must be awarded with caution to avoid preempting a litigant's right to trial by jury or the right to fully present the factual basis of a case where a material dispute may exist. *Anderson*, 317 Ill. App. 3d at 1110, 740 N.E.2d at 824-25. Thus, summary judgment "should be allowed only when the right of the moving party is clear and free from doubt" (*Jones*, 191 Ill. 2d at 291, 730 N.E.2d at 1127), and "[w]here doubt exists, the wiser judicial policy is to permit resolution of the dispute by a trial" (*Meck v. Paramedic Services*, 296 Ill. App. 3d 720, 725, 695 N.E.2d 1321, 1324-25 (1998)). We review *de novo* the trial court's grant of summary judgment. *Ferguson*, No. 89144, slip op. at 3. Accordingly, we afford no deference to the trial court's decision and instead, we consider anew the pleadings, affidavits, depositions, admissions, and exhibits on file to determine whether the trial court's decision was correct. *Bank One, Springfield v. Roscetti*, 309 Ill. App. 3d 1048, 1054, 723 N.E.2d 755, 759 (1999).

•7 Initially, we note that in reviewing a trial court's grant of summary judgment, it is not our duty to assess the strength of the qualifications, credibility, and testimony of Cox and Philbrick against those of Graham and Kohr. Instead, we must determine whether Cox's and Philbrick's affidavits were sufficient to create issues of fact on whether Graham deviated from the appropriate standard of care and whether that deviation caused Curtis' death. In this case, both Cox's and Philbrick's affidavits state that Graham's care and treatment of Curtis deviated from the national standard of medical care. Both Cox and Philbrick opined that (1) when Graham examined Curtis on July 19, 1995, Curtis showed signs and symptoms of deep vein thrombosis in his lower right leg; (2) Graham deviated from the standard of care by failing to properly diagnose and treat Curtis' deep vein thrombosis; and (3) Graham's deviation from the appropriate standard of care caused Curtis' death. Viewing Cox's and Philbrick's affidavits strictly against Graham and liberally in Jackson's favor, we conclude that the affidavits are sufficient to create issues of fact regarding whether Graham deviated from the appropriate standard of care and whether that deviation caused Curtis' death. Accordingly, we hold that the trial court erred by granting Graham's motion for summary judgment.

### III. CONCLUSION

For the reasons stated, we reverse the trial court's judgment and remand for further proceedings.

Reversed and remanded.

MYERSCOUGH and KNECHT, JJ., concur.