# Illinois Official Reports

## Appellate Court

<div style="border:1px solid">

### *Monson v. City of Danville*, 2017 IL App (4th) 160593

</div>

| | |
|---|---|
| Appellate Court Caption | BARBARA MONSON, Plaintiff-Appellant, v. THE CITY OF DANVILLE, a Home Rule Municipality, Defendant-Appellee. |
| District & No. | Fourth District<br>Docket No. 4-16-0593 |
| Rule 23 order filed<br>Motion to publish<br>allowed<br>Opinion filed | May 9, 2017<br><br>June 15, 2017<br>June 15, 2017 |
| Decision Under Review | Appeal from the Circuit Court of Vermilion County, No. 13-L-71; the Hon. Nancy S. Fahey, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Miranda L. Soucie, of Spiros Law, P.C., of Danville, for appellant.<br><br>Scott B. Dolezal and Scott D. McKenna, of Best, Vanderlaan & Harrington, of Chicago, for appellee. |
| Panel | JUSTICE STEIGMANN delivered the judgment of the court, with opinion.<br>Justices Holder White and Pope concurred in the judgment and opinion. |

¶ 1    In December 2013, plaintiff, Barbara Monson, sued defendant, the City of Danville (City), requesting compensation for injuries she sustained as a result of her tripping and falling onto a sidewalk the City maintained.

¶ 2    In March 2015, the City filed a motion for summary judgment pursuant to section 2-1005 of the Code of Civil Procedure (735 ILCS 5/2-1005 (West 2014)). Following a July 2016 hearing, the trial court granted summary judgment in the City's favor, finding that the City was immune under sections 2-109 and 2-201 of the Local Governmental and Governmental Employees Tort Immunity Act (Act) (745 ILCS 10/2-109, 2-201 (West 2014)).

¶ 3    Monson appeals, arguing essentially that the trial court erred by granting summary judgment in the City's favor because the court misapplied the immunity afforded by the Act. For the reasons that follow, we affirm.

¶ 4                                    I. BACKGROUND

¶ 5    The following synopsis was gleaned from the parties' pleadings, depositions, affidavits, and other supporting documents filed in the trial court.

¶ 6    On the afternoon of December 7, 2012, Monson went shopping. The temperature that day was mild, and conditions were wet because of an earlier rainstorm. Upon leaving a store in the City's downtown district, Monson walked north to her car, which was parked facing east on an intersecting street about five storefronts away. When she reached the intersection, Monson turned east and walked on the sidewalk between the side of a pharmacy (to her right) and a lamppost positioned closer to the street (to her left). Monson then walked at an angle toward the street curb where she had parked her car. As Monson did so, she walked into an inch of water that had formed on the sidewalk to the right of the lamppost. At that moment, Monson felt her left shoe strike something, which caused her to lose her balance, fall forward, and hit her chin on the sidewalk. Monson required nine stitches to close the cut to her chin and suffered bruising to her left toe, arms, lips, neck, and bicep. Monson also had dental work performed on two chipped teeth and a crown that had partially dislodged from another tooth.

¶ 7    In December 2013, Monson sued the City, alleging that the City's negligence and willful and wanton misconduct in failing to repair an uneven seam between two slabs of sidewalk concrete was the direct and proximate cause of her fall. In her prayer for relief, Monson requested compensation for the injuries she sustained as a result of her striking the defect.

¶ 8    In March 2015, the City filed a motion for summary judgment, in which it included the discovery depositions of (1) Shelly Larson, the City's superintendant of downtown services, and (2) James Douglas Ahrens, the City's public works director.

¶ 9    Larson testified that her various responsibilities as the City's superintendant of downtown services included maintaining the downtown sidewalks. In 2011, Larson personally walked the City's downtown district and spray painted places that she believed required repair, replacement, or removal. Shortly thereafter, the City's engineer toured each site with Larson to determine what recommendations, if any, to make. Larson noted that work later performed on the downtown sidewalks included portions near where Monson had fallen, which were markedly distinct in color from the original concrete.

¶ 10    Larson learned of Monson's claim against the City in late spring 2013, when she accompanied Cathy Courson, the City's risk manager, as Courson took pictures of where Monson had fallen. Upon arriving, Larson saw "a low spot of moisture" and repositioned a nearby city garbage receptacle to prevent other pedestrians from encountering the low spot. Larson did so because she believed that an uneven seam existed between adjoining slabs of concrete, and she wanted to prevent pedestrians from encountering that deviation.

¶ 11    Ahrens testified that the decision to repair, replace, or remove a slab of concrete is a case-by-case determination based upon numerous factors, which included the (1) intended use of the area, (2) normal path of travel, (3) condition of the concrete, (4) proximity to other obstructions, (5) elevation deviations between concrete sections, (6) availability of personnel, and (7) costs. Although not documented as City policy, Ahrens agreed that the aforementioned factors were developed over multiple years in consultation and collaboration with other City departments and personnel. Ahrens stated that the deviation between the two concrete slabs at issue was less than two inches, but elevation deviations alone were not a definitive factor in deciding whether to repair, replace, or remove a slab of concrete.

¶ 12    In fall 2011, Ahrens began a City project to "enhance the downtown area" and "improve sidewalk conditions" by inspecting "every slab of concrete in the downtown area." Ahrens explained that Larson and the City's engineer made initial recommendations regarding areas they believed required attention. Larson and others later accompanied Ahrens on an inspection of the City's downtown, which included viewing their recommendations. Ahrens averred that although he could not specifically recall if he inspected the exact slab of concrete where Monson had fallen, his walk-through of the downtown area would have included that area. Ahrens confirmed that he made the final decisions regarding repair, replacement, or removal. In his affidavit, Ahrens stated that he "utilized [his] discretion as the public works director to determine which portions of [the] sidewalks were in need of repair and which portions were not in need of repair." In March 2012, the enhancement project was completed.

¶ 13    In July 2016, the trial court conducted a hearing on the City's motion for summary judgment and, thereafter, took the matter under advisement. Later that month, the court entered the following order:

> "[The City's] motion for summary judgment is granted. The Court, in its decision, relies heavily on [*Richter v. College of Du Page*, 2013 IL App (2d) 130095, 3 N.E.3d 902,] which the court feels addresses the issues raised by both [Monson] and [the City] ***.
>
> The Court finds, based on the depositions of *** Ahrens and *** Larson, that *** Ahrens was the one that made decisions about sidewalk repair. *** Larson would mark *** areas on the sidewalk that she deemed problematic while inspecting the downtown sidewalks. After *** Larson's inspection, she notified *** Ahrens who, along with *** Larson and others, would conduct his own inspection. *** Ahrens would then apply certain factors and make a determination as to what areas would be repaired or altered and how. *** Ahren's [*sic*] indicated that the general area where *** Monson fell was considered in making his final determination because he looked at every slab of concrete in the downtown area.

- 3 -

The factors *** Ahrens used in making his decision were not contained in any document or policy within the city which required action if certain factors existed and therefore, *** Ahren's [*sic*] actions were discretionary and not ministerial.

As in [*Richter*], the Plaintiff here relies on [section] 3-102 of the [Act] which applies to ministerial functions rather than discretionary functions and policy determinations. As in this case, the parties in [*Richter*] disputed which section of the [Act] controlled the outcome of the case.

Courts have defined a 'policy determination' requirement as a decision that requires the public entity to balance competing interests and to make a judgment call as to what solution will best serve each of those interests.

This Court finds that there is no question of material fact that the City determined policy when handling sidewalk decisions. *** Larson discussed how she personally walked along the sidewalks and marked any perceived areas of concern. She then informed *** Ahrens who then walked the same area, applied a litany of factors as outlined in his deposition and made a decision by weighing those factors.

This case stands in contrast to cases in which mandatory compliance with certain regulations or statutes rendered the acts ministerial. In this case, *** Ahrens possessed absolute discretion to resolve each sidewalk issue.

Because this Court finds that section[s] 2-109 and 2-201 of the [Act] grant immunity to the defendant and that summary judgment should be entered for the defendant, the court will not consider plaintiff's arguments in the alternative."

¶ 14    This appeal followed.

¶ 15                    II. THE TRIAL COURT'S GRANT OF SUMMARY JUDGMENT
¶ 16                        A. Summary Judgment and the Standard of Review
¶ 17    "Summary judgment is proper when the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Internal quotation marks omitted.) *Navistar Financial Corp. v. Curry Ice & Coal, Inc.*, 2016 IL App (4th) 150419, ¶ 18, 55 N.E.3d 153. The interpretation of a statute, such as the Act, presents an issue of law that is appropriate for summary judgment. *Hooker v. Retirement Board of the Firemen's Annuity & Benefit Fund*, 2013 IL 114811, ¶ 15, 4 N.E.3d 15. "Issues of statutory interpretation and summary judgment rulings are reviewed *de novo*." *Id.*

¶ 18                        B. The Purpose of the Act and the Pertinent Sections the
                            Trial Court Based Its Ruling Upon
¶ 19    "The Act serves to protect local public entities and public employees from liability arising from the operation of government." *Van Meter v. Darien Park District*, 207 Ill. 2d 359, 368, 799 N.E.2d 273, 279 (2003). By its enactment, "the General Assembly sought to prevent the dissipation of public funds on damage awards in tort cases." *Id.* In *Hascall v. Williams*, 2013 IL App (4th) 121131, ¶ 20, 996 N.E.2d 1168, this court provided the following synopsis regarding the Act:

"The [Act] grants only immunities and defenses; it does not create duties. Rather, the [Act] merely codifies existing common-law duties, to which the delineated

- 4 -

immunities apply. [Citations.] Therefore, whether a local public entity owed a duty of care and whether that entity enjoyed immunity are separate issues. Once a court determines that a duty exists, it then addresses whether the [Act] applies."

"Unless an immunity provision applies, municipalities are liable in tort to the same extent as private parties." *Van Meter*, 207 Ill. 2d at 368-69, 799 N.E.2d at 279. Governmental entities must prove they are entitled to immunity to successfully bar a plaintiff's right to recover. *Hascall*, 2013 IL App (4th) 121131, ¶ 20, 996 N.E.2d 1168.

¶ 20 In this case, the trial court granted summary judgment in the City's favor, finding that the City was immune from liability under sections 2-109 and 2-201 of the Act. Section 2-109 of the Act provides that "[a] local public entity is not liable for an injury resulting from an act or omission of its employee where the employee is not liable." 745 ILCS 10/2-109 (West 2014). Section 2-201 of the Act provides, as follows:

"Except as otherwise provided by Statute, a public employee serving in a position involving the determination of policy or the exercise of discretion is not liable for an injury resulting from his act or omission in determining policy when acting in the exercise of such discretion even though abused." 745 ILCS 10/2-201 (West 2014).

¶ 21 C. *Richter* and Section 3-102 of the Act

¶ 22 Even though we review the trial court's grant of summary judgment *de novo*, we provide a brief synopsis of the Second District's decision in *Richter*, which the trial court found dispositive. We first, however, quote section 3-102 of the Act to provide context:

"(a) Except as otherwise provided in this Article, a local public entity has the duty to exercise ordinary care to maintain its property in a reasonably safe condition for the use in the exercise of ordinary care of people whom the entity intended and permitted to use the property in a manner in which and at such times as it was reasonably foreseeable that it would be used, and shall not be liable for injury unless it is proven that it has actual or constructive notice of the existence of such a condition that is not reasonably safe in reasonably adequate time prior to an injury to have taken measures to remedy or protect against such condition." 745 ILCS 10/3-102 (West 2014).

¶ 23 In *Richter*, a student sued the college she had been attending after tripping over an approximately 1½-inch height deviation between the two concrete slabs. *Richter*, 2013 Ill. App (2d) 130095, ¶¶ 4, 8, 3 N.E.3d 902. The college filed an answer, raising, in pertinent part, the affirmative defense of immunity pursuant to section 3-102 of the Act. *Id.* ¶ 5. The trial court later granted the college leave to file an additional affirmative defense under sections 2-109 and 2-201 of the Act. *Id.* ¶ 6. Eventually, the college moved for summary judgment, claiming discretionary immunity under sections 2-109 and 2-201 of the Act. *Id.* ¶ 23.

¶ 24 In granting summary judgment in the college's favor, the trial court found that with regard to section 3-102 of the Act, genuine issues of material fact remained as to whether (1) the college had prior notice of the deviation and (2) the open and obvious exception applied given the location of the defect. *Id.* ¶ 24. The court then focused on sections 2-109 and 2-201 of the Act, ruling that no genuine issues of material fact existed. *Id.* ¶ 25. Specifically, the court found that the college's building and grounds director (1) established a policy on how to handle such deviations and (2) exercised his discretion regarding whether, how, and when

to fix such defects. *Id.* In so finding, the court distinguished the discretion the college's building and grounds director exercised from that of a ministerial act—that is, an action in which no discretion is afforded because the conduct is mandated by, for example, a law, ordinance, or regulation. *Id.* ¶ 26. In this regard, the court ruled that the college's building and grounds director exercised the discretion that afforded him—and by extension the college—immunity under sections 2-109 and 2-201 of the Act. *Id.* ¶ 27.

¶ 25 On appeal, the question before the Second District was whether section 3-102 or section 2-201 of the Act controlled the outcome of the case. *Id.* ¶ 36. The student argued that because section 3-102 of the Act required the college to maintain its property in a reasonably safe condition, a question of material fact remained as to whether the college exercised ordinary care in repairing the height deviation in a reasonable amount of time after learning of its existence. *Id.* ¶ 37. The college responded that its building and grounds director's handling of the height deviation clearly involved policy and discretion, which afforded the college immunity under section 2-201 of the Act. *Id.* ¶ 39.

¶ 26 The Second District affirmed the trial court's judgment, concluding that based on the record before it, no genuine issues of material fact existed on the issues of the policy the college's building and grounds director devised in addressing such deviations and the discretion he exercised in determining how and when to fix such defects. *Id.* ¶¶ 40-45. In so concluding, the Second District determined that the cases the student relied upon in support of her argument were distinguishable. *Id.* ¶¶ 47-49.

¶ 27 <center>D. Monson's Claim of Error</center>

¶ 28 In her brief to this court, Monson makes several arguments that challenge the trial court's grant of summary judgment in the City's favor. Our review of those arguments reveals that the prevailing theme of her claims can be summarized as follows: that the court erred by granting summary judgment in the City's favor because the court misapplied the immunity afforded by the Act. Specifically, Monson contends that in this case "the immunities afforded by [sections] 2-109 and *** 2-201 (general provisions) are superseded by the exceptions to immunity found within [section] 3-102 (a particular provision)." We reject Monson's contention as it reveals a fundamental misunderstanding of those specific statutory provisions of the Act.

¶ 29 In *Kennell v. Clayton Township*, 239 Ill. App. 3d 634, 639-40, 606 N.E.2d 812, 815-16 (1992), this court provided the following explanation regarding the relationship between sections 2-109 and 2-201 of the Act with section 3-102 of the Act:

> "The common law extended immunity to local governmental entities engaged in governmental or discretionary functions, but held them liable for negligence in the performance of ministerial functions. *** Discretionary acts are those which are unique to the particular public office and involve the exercise of judgment. [Citation.] On the other hand, ministerial acts are those *** performed in a prescribed manner, in obedience to the mandate of legal authority, without regard to the exercise of discretion as to the propriety of the acts being done. [Citation.]
>
> The Act was an effort by the legislature to restore common law municipal immunity abolished by the Illinois Supreme Court in *Molitor v. Kaneland Community Unit District No. 302* (1959), 18 Ill. 2d 11, 163 N.E.2d 89. Thus, while the Act codifies the common law, it does not create any new duties. [Citations.]"

- 6 -

¶ 30    Under *Kennell*, Monson's contention fails because the discretionary acts governed by sections 2-109 and 2-201 of the Act are unmistakably distinct from the acts governed by section 3-102 of the Act. In other words, those specific provisions pertain to factual scenarios that are mutually exclusive. The absolute immunity afforded municipalities for discretionary acts under sections 2-109 and 2-201 of the Act could not be superseded by section 3-102 of the Act, which governs ministerial acts. As we indicated in *Kennell*, no conflicts exist between these provisions of the Act because they address diametrically distinct issues—that is, where the act or omission at issue is discretionary and where the act is mandated by law. If, as here, a factual scenario involves the formulation of policy and discretion in executing that policy, then any subsequent analysis begins and ends with sections 2-109 and 2-201 of the Act, and the provisions in Article III of the Act are not applicable at all.

¶ 31    In support of her contention, Monson relies on cases that are distinguishable because they do not concern acts or omission of a public entity where discretion was at issue. See *Horton v. City of Ottawa*, 40 Ill. App. 3d 544, 548, 352 N.E.2d 23, 26 (1976) (city was liable because section 3-105 of the Act expressly excluded physical damage or deterioration of streets from immunity); *Murray v. Chicago Youth Center*, 224 Ill. 2d 213, 234, 864 N.E.2d 176, 188-89 (2007) (youth center was liable because, although immunity was afforded under section 3-109(a) of the Act for the hazardous recreational activity at issue, the willful and wanton exception under section 3-109(c) of the Act applied); *Hascall*, 2013 IL App (4th) 121131, ¶ 32, 996 N.E.2d 1168 (summarizing the holding in *Murray*). Monson's reliance on this court's decision in *Courson v. Danville School District No. 118*, 301 Ill. App. 3d 752, 704 N.E.2d 447 (1998), is also unpersuasive. In *Courson*, we reversed the trial court's grant of summary judgment because the school district failed to establish that the absence of a safety guard on a table saw was a discretionary decision as contemplated by the Act. *Id.* at 758, 704 N.E.2d at 451.

¶ 32    In *Van Meter*, 207 Ill. 2d at 373, 799 N.E.2d at 281, the supreme court reaffirmed the dual-pronged inquiry required to determine whether section 2-201 immunity applies. Specifically, that immunity afforded under section 2-201 of the Act is not applicable unless the plaintiff's injuries were the result of acts performed or omitted by the public entity in determining policy and exercising discretion in executing that policy. *Id.*

¶ 33    Here, as in *Richter*, the acts or omissions that Monson challenges constituted discretionary acts and policy determinations taken by Ahrens, the City's public works director. Ahrens testified that the policy regarding the repair, replacement, or removal of a slab of concrete was to be undertaken on a case-by-case basis using numerous factors, which were developed over multiple years in consultation and collaboration with other City departments and personnel. In fall 2011, Ahrens used his discretion in implementing those policy considerations as he began a project to enhance the City's downtown area, confirming that he "utilized [his] discretion as the Public Works Director to determine which portions of [the] sidewalks were in need of repair and which portions were not in need of repair."

¶ 34    Monson further claims that Ahrens' testimony established that the City had actual notice of the dangerous condition, which would have negated any immunity afforded under section 3-102 of the Act. For reasons we have previously articulated, we need not engage in such an analysis. However, we note that regardless of how the City became aware of the deviation—whether by routine maintenance inspection or by actual notice provided by a pedestrian—the City would have retained immunity under section 2-109 of the Act if Ahrens

had inspected the defect and exercised his discretion to do nothing, even if that determination could later be viewed as negligent. See *Hascall*, 2013 IL App (4th) 121131, ¶ 22, 996 N.E.2d 1168 ("In section 2-201, the legislature immunized liability for both negligence and willful and wanton misconduct." (Internal quotation marks omitted.)).

¶ 35     Because we conclude that there was no genuine issue of material fact that the City was immune from liability under section 2-109 of the Act, we affirm the trial court's grant of summary judgment in the City's favor.

¶ 36                                       III. CONCLUSION
¶ 37     For the foregoing reasons, we affirm the trial court's judgment.

¶ 38     Affirmed.