# Illinois Official Reports

## Appellate Court

*Richter v. College of Du Page*, 2013 IL App (2d) 130095

| | |
|---|---|
| Appellate Court Caption | BLANCHE RICHTER, Plaintiff-Appellant, v. COLLEGE OF DU PAGE, Defendant-Appellee. |
| District & No. | Second District<br>Docket No. 2-13-0095 |
| Filed | December 31, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In an action for the injuries plaintiff suffered when she tripped and fell on an uneven sidewalk at defendant college, summary judgment was properly entered for the college on the ground that discretionary immunity under sections 2-109 and 2-201 of the Tort Immunity Act applied, notwithstanding plaintiff's contention that the duty to maintain property under section 3-102 of the Act made the sidewalk repair a ministerial function that could result in the college being liable if it was negligent in making the repair, since the college employee responsible for sidewalk repairs had unfettered discretion, he assessed each sidewalk problem individually, and he was not bound to follow any set of statutory or regulatory rules or guidelines; therefore, discretionary immunity barred plaintiff's claim. |
| Decision Under Review | Appeal from the Circuit Court of Du Page County, No. 10-L-303; the Hon. Dorothy French Mallen, Judge, presiding. |
| Judgment | Affirmed. |

| Counsel on Appeal | Mario C. Palermo and Dexter J. Evans, both of Woodruff Johnson & Palermo, of Aurora, for appellant. |
|---|---|
| | Kenneth M. Florey and Scott L. Ginsburg, both of Robbins, Schwartz, Nicholas, Lifton & Taylor, Ltd., of Chicago, for appellee. |
| Panel | JUSTICE SPENCE delivered the judgment of the court, with opinion. Justices McLaren and Hutchinson concurred in the judgment and opinion. |

**OPINION**

¶ 1    Plaintiff, Blanche Richter, filed suit against defendant, the College of Du Page (the College), after falling on an uneven sidewalk. The College raised an affirmative defense under sections 2-109 and 2-201 of the Local Governmental and Governmental Employees Tort Immunity Act (Tort Immunity Act) (745 ILCS 10/2-109, 2-201 (West 2010)) and moved for summary judgment. At issue is whether the handling of the sidewalk deviation was a discretionary act under section 2-201 (745 ILCS 10/2-201 (West 2010)) or a ministerial act under section 3-102 (745 ILCS 10/3-102 (West 2010)) of the Tort Immunity Act. The trial court determined that the College was entitled to discretionary immunity under sections 2-109 and 2-201 because the handling of the sidewalk deviation was both an exercise of discretion and a policy determination, as opposed to a ministerial act. The court granted the College's motion for summary judgment, and plaintiff appeals. We affirm.

¶ 2                                    I. BACKGROUND
¶ 3                         A. Complaint and Affirmative Defenses
¶ 4    On March 3, 2010, plaintiff filed a complaint against the College, alleging as follows. On March 12, 2009, at about 6:50 p.m., plaintiff was approaching the revolving door on the south side of the Student Resource Center (SRC) building. As she neared the revolving door, plaintiff caught her foot on a raised portion of the sidewalk, causing her to fall forward against the revolving door and sustain injuries. Plaintiff alleged that the College had actual notice of the uneven walkway prior to March 12, 2009, and had painted the raised portion of the sidewalk yellow. Plaintiff alleged that the College was negligent for failing to repair the uneven sidewalk.

¶ 5    The College filed an answer and raised three affirmative defenses to plaintiff's complaint. First, the College argued that the height differential between the slabs of concrete in the sidewalk was *de minimis*. Second, the College argued that it was immune under section 3-102 of the Tort Immunity Act because it maintained its premises and did not have actual or

constructive knowledge that the sidewalk was not reasonably safe. Third, the College argued that the risk was open and obvious to plaintiff.

¶ 6 Eventually, and over plaintiff's objection, the College was given leave to file an additional affirmative defense under sections 2-109 and 2-201 of the Tort Immunity Act. The College argued that it was entitled to discretionary immunity under those two sections of the Tort Immunity Act.

¶ 7 B. Deposition Testimony

¶ 8 The record contains several depositions. In plaintiff's deposition, she testified that she was a 45-year-old student at the College. On March 12, 2009, she was going to class at the SRC building, wearing a "pant boot" with a wedge heel. The area was well-lit and it was still "pretty light out." Plaintiff was familiar with the area, as she was "well into the semester." As she walked toward the revolving door, plaintiff felt her heel get caught. The next thing plaintiff knew, she "was flying towards the revolving door." Her knee hit the ground and her shoulder and face hit the revolving door. The raised portion of the sidewalk, about 1 to 1½ inches high, was approximately 3 feet from the revolving door. Plaintiff admitted that she was not looking at the ground before she fell, because she was looking to see whether someone was exiting through the revolving door. She did not see any yellow paint or sign warning of an uneven surface. Plaintiff stated that, when walking, she generally did not look at the ground; she looked straight ahead.

¶ 9 Lauri Page, plaintiff's friend, took plaintiff to retrieve her car from the College the day after the accident. Page saw the 1-to 1½-inch raise in the sidewalk where plaintiff fell; a yellow line was painted across the raise. It was a "pretty obvious raise" because of its size.

¶ 10 Susan Benton, the benefits manager at the College, worked in the SRC building. If Benton saw something unsafe on the College grounds, she would call the foreman of the buildings-and-grounds department. Benton offered conflicting testimony as to whether she called about an uneven sidewalk near the south entrance of the SRC building before or after March 2009. Later, Benton said that she called the buildings-and-grounds department because she observed a raise in the sidewalk and thought that it "could present an issue" or a safety hazard. At most, the raise was one-quarter of one inch. Benton was not aware that anyone besides plaintiff had stumbled on the uneven sidewalk. Within a short period of time after she called, Benton noticed yellow paint on the sidewalk. In addition, two orange cones "appeared shortly after [her] phone call, if not that day within the next day."

¶ 11 Benton could not remember whom or when she called about the uneven sidewalk. When pressed, Benton testified that she would have called the buildings-and-grounds department, but did not remember whom she called. She thought Tom Stephenson was the foreman at the time; she thought "that's when he was still there." As far as when she called, Benton thought that it was in the late fall of 2008 or 2009, but it could have been in the late fall of 2007 or 2010; she had "no idea." In fact, Benton was not even sure she called in the late fall; she might have called in December 2008 or 2009 or in January or February 2009. The sidewalk was repaired "during that academic year after [she] made the phone call," and the academic year was from

August through May. Benton believed that the repair was "directly related to" her phone call. Assuming that she called in the late fall, the repair would have been done prior to May of the next year.

¶ 12    Phil Gieschen, the coordinator of risk management for the College, explained that during the season of "freeze and thaw" concrete slabs would shift, depending on what was beneath them. When this occurred, there were three levels of approach: first, put out an orange cone; second, apply yellow paint; and third, physically alter the concrete. There were various ways to physically repair a sidewalk, including patching or grinding. Patching and grinding were not done until after the freeze-and-thaw season, because the slabs of concrete could continue to shift, thus creating a trip hazard. Gieschen stated that, if a slab were physically altered and then shifted again, the College would be faced with the trip hazard again. If a trip hazard occurred during a three-or four-month season of freeze and thaw and could not be physically altered, the standard procedure was to flag it with yellow paint. Once a slab was flagged, the College kept "an eye on it" through the buildings-and-grounds department.

¶ 13    Gieschen saw a field report of plaintiff's fall within one week of its occurrence. The College's standard procedure was to apply yellow paint when a report of a trip hazard came in, to alert individuals that there was a deviation in the sidewalk. At first, Gieschen thought that yellow paint was applied to the sidewalk after plaintiff fell, but photographs revealed that yellow paint was already present when she fell. The raise in the sidewalk, which was five-eighths of one inch, was repaired in March or April 2010 pursuant to a work order.

¶ 14    Within the three-month period after plaintiff's fall, Gieschen learned from Chris Kornsey that two other individuals had stumbled at the same location. The individuals stumbled but did not fall; otherwise, a field report would have been generated. Gieschen thought that the people who had stumbled were employees, including Benton. However, Gieschen admitted that Benton might not have stumbled but might have simply called in to report the potential hazard. Gieschen estimated that 5,000 people used the south entrance to the SRC building on a daily basis.

¶ 15    Bryan Schacht testified that he worked for the College as a carpenter in the buildings-and-grounds department. For the past 10 years, his job responsibilities included fixing uneven slabs of sidewalk. Sidewalk repairs occurred primarily in the spring due to the thawing of the ground. The protocol for an uneven sidewalk was putting a cone on it and then highlighting it with yellow paint to alert the public. Sometimes, the College made the discretionary decision to leave the cone after the yellow paint had dried, as a further precaution. Sidewalks were not ground down until springtime, because there was constant movement of the slabs during the freeze-and-thaw season. The movement was random. Sometimes, the slabs moved back and cured the deviation on their own. The slabs that did not correct themselves were ground down.

¶ 16    Schacht testified that Kornsey became his supervisor in 2008 or 2009; Schacht could not remember specifically. Prior to Kornsey, Stephenson was Schacht's supervisor. Kornsey was the one who defined whether an uneven sidewalk was a trip hazard. A sidewalk deviation was addressed by a work order, which described how to handle the deviation. Applying yellow paint did not require a written work order; it could be done based on a phone call from

Kornsey, which was a verbal work order. The routine for an uneven sidewalk was to mark it with cones, highlight it with yellow paint, float it (by putting down concrete material), and grind it with a machine.

¶ 17     The written work order for this particular uneven sidewalk did not refer to the yellow paint. Schacht had painted the yellow line, but he did not remember when. He was also part of the crew that repaired the sidewalk in March and April 2010. Concrete material was put on the sidewalk to make it smoother. The crew had "been back there once or twice."

¶ 18     Kornsey testified that he began working for the College in June 2008; he managed the buildings-and-grounds department. He explained the freeze-and-thaw process, which is known as "heaving." When frost would get in the ground, it created more space, which pushed the sidewalk up. The final thaw typically occurred in March or April. Twice a year, before and after winter, Kornsey and Schacht would inspect the campus to look at the deviations in the sidewalks. Also, the campus was inspected after snow conditions or if a staff member reported a problem.

¶ 19     If a concrete "issue" occurred in the winter, it was addressed on a "per instance" basis. No College policy required Kornsey to treat every sidewalk deviation in the same way. Kornsey did not just apply yellow paint to a sidewalk deviation in the winter; if a deviation was abnormally dangerous, it was within his discretion to fix it in the winter. Likewise, it was within Kornsey's discretion to do nothing whatsoever. Whether to repair a sidewalk after winter was determined by "just kind of looking at it, see if it's settled out." There was no particular measurement or demarcation of deviation that warranted repair; the decision was based on "work history and experience." For example, the College did not have a policy that, if the deviation were one-quarter of one inch or less, it would not be fixed: whether to repair a sidewalk was solely Kornsey's determination. Kornsey did not need approval from anyone to make a repair; he had unfettered discretion. He explained that it was a "per-case type of thing that we would look at it and see if it's large enough, how tall it is, how high it is, if it's settled." Another factor was whether the deviation was in a heavily traveled area, which this sidewalk was.

¶ 20     In March 2009, the human resources department called Kornsey to investigate the area where plaintiff fell, because "a few people had slipped." Later, Kornsey clarified that he was aware of only one person other than plaintiff who had tripped. It was someone from human resources, but Kornsey did not know if it was Benton. When asked about the yellow line painted on the uneven sidewalk, Kornsey believed that "it was [done] after the calls that [he] had [received] that somebody had tripped there from the human resource department because that was during the wintertime." Kornsey could not find a work order for the yellow paint. However, the yellow paint was present before plaintiff fell in March 2009, which meant that someone would have tripped prior to plaintiff's fall. Kornsey could not pinpoint whether someone tripped in January or February 2009. In his second deposition, Kornsey thought that the human resources employee who tripped was Benton. However, when questioned, Kornsey said that it was possible that Benton just noticed the deviation and did not trip over it.

¶ 21     The yellow paint was the same product that was used on roadways for high visibility. Before the painting was done, cones were placed at this location. Kornsey did not know if the

cones were taken away once the sidewalk was painted; there was no protocol. The sidewalk was not physically repaired after plaintiff fell in March 2009, because it was "in the winter months." The follow-up on the sidewalk happened after the final thaw and prior to the following winter. The photographs showed that the sidewalk deviation was repaired before March 26, 2010. Patch work was done and then the entire area was "planed down." Kornsey stated that the repair would have been done in the springtime, after the raised concrete slab did not lower back down.

¶ 22                           C. Summary Judgment Motion and Decision

¶ 23      On October 30, 2012, the College moved for summary judgment on the basis that it was entitled to discretionary immunity under sections 2-109 and 2-201 of the Tort Immunity Act.

¶ 24      On January 7, 2013, the trial court granted the College's motion for summary judgment. First, regarding the issue of whether the College exercised ordinary care under section 3-102 of the Tort Immunity Act, the trial court agreed with plaintiff that there was a question of fact as to when and whom Benton notified regarding the defect in the sidewalk. Thus, without "getting to the immunity part yet" under section 2-201, the court stated that Benton's testimony, which the court found "confusing" and "speculative," created a question of fact as to whether the College exercised ordinary care under section 3-102. A second question of fact was whether the danger was open and obvious, given the nearby revolving door that plaintiff was approaching when she fell.

¶ 25      On the issue of immunity under section 2-201, the court made the following findings. Kornsey was the one who "made the decision as to how to handle the deviations in the sidewalks that occurred during the freeze/thaw cycle during the wintertime." The court found that Kornsey "did establish a policy as to how to handle deviations in the sidewalk that were a result of freeze/thaw." Kornsey's policy was to place cones as soon as the College found out about a deviation and paint it yellow so that people could see it during the winter. Then, in the spring, when the College could repair the sidewalks, Kornsey would exercise discretion as to whether to fix them, how to fix them, and when to fix them. The court stated that it had "never really seen a better case, actually, of what it meant by policy and discretion when you put them both together. So it was an overall policy that [Kornsey] established, and then he had to make the discretionary decision as to this particular slab." Therefore, there was no genuine issue of material fact as to whether Kornsey made a policy determination.

¶ 26      Regarding Kornsey's exercise of discretion, the court stated that the testimony showed that he made the "discretionary decision as to how to repair this and when to repair this" sidewalk. In discussing the distinction between ministerial and discretionary acts, the court noted that there was no law stating that a sidewalk deviation that was one inch or above must be repaired within 30 days from notification. If there were a law to that effect, the repair would be ministerial. On this point, the court referred to *Anderson v. Alberto-Culver USA, Inc.*, 317 Ill. App. 3d 1104 (2000), which discussed ministerial versus discretionary acts. The court reasoned that "it's ministerial if you're required by law to do something, but it's discretionary" otherwise.

¶ 27　　The court continued that, if there had been a "work order" that the College did not follow, then "that becomes ministerial, but you don't have that at this point, and even if you had evidence that Mr. Kornsey made the discretionary decision not to repair it," then "that's still a discretionary opinion–decision that they have immunity for, even if abused. That's the problem." For these reasons, the court granted summary judgment in favor of the College.

¶ 28　　Plaintiff timely appealed.

II. ANALYSIS

¶ 29

A. Standard of Review

¶ 30

¶ 31　　Summary judgment motions are governed by section 2-1005 of the Code of Civil Procedure (735 ILCS 5/2-1005 (West 2012)). Summary judgment should be granted only where the pleadings, depositions, admissions, and affidavits on file, when viewed in the light most favorable to the nonmoving party, show that there is no genuine issue as to any material fact and that the moving party is clearly entitled to judgment as a matter of law. *Pielet v. Pielet*, 2012 IL 112064, ¶ 29. Although a plaintiff is not required to prove his or her case at the summary judgment stage, in order to survive a motion for summary judgment, the nonmoving party must present a factual basis that would arguably entitle him or her to a judgment. *Oliveira-Brooks v. ReMax International, Inc.*, 372 Ill. App. 3d 127, 134 (2007). Our review of the trial court's grant of summary judgment is *de novo*. *Lazenby v. Mark's Construction, Inc.*, 236 Ill. 2d 83, 93 (2010).

B. Tort Immunity Act

¶ 32

¶ 33　　Unless an immunity provision applies, a public entity is liable in tort to the same extent as a private party. *Trtanj v. City of Granite City*, 379 Ill. App. 3d 795, 802-03 (2008). The Tort Immunity Act is strictly construed against the public entity seeking immunity. *Id.* at 803.

¶ 34　　The College argues that its handling of the sidewalk deviation in this case involved a discretionary act and that it is entitled to immunity under sections 2-109 and 2-201 of the Tort Immunity Act. Sections 2-109 and 2-201 grant immunity to public entities for the performance of discretionary functions. *Id.* Section 2-109 provides that "[a] local public entity is not liable for an injury resulting from an act or omission of its employee where the employee is not liable." 745 ILCS 10/2-109 (West 2010). Section 2-201 states that "[e]xcept as otherwise provided by Statute, a public employee serving in a position involving the determination of policy or the exercise of discretion is not liable for an injury resulting from his act or omission in determining policy when acting in the exercise of such discretion even though abused." 745 ILCS 10/2-201 (West 2010).

¶ 35　　Plaintiff responds that the College's duty to keep sidewalks in a reasonably safe condition is a ministerial function rather than a discretionary function. For this argument, she relies on section 3-102 of the Tort Immunity Act, which states:

> "Except as otherwise provided in this Article, a local public entity has the duty to exercise ordinary care to maintain its property in a reasonably safe condition for the use in the exercise of ordinary care of people whom the entity intended and permitted to use

- 7 -

the property in a manner in which and at such times as it was reasonably foreseeable that it would be used, and shall not be liable for injury unless it is proven that it has actual or constructive notice of the existence of such a condition that is not reasonably safe in reasonably adequate time prior to an injury to have taken measures to remedy or protect against such condition." 745 ILCS 10/3-102 (West 2010).

¶ 36    The parties agree that section 3-102 applies to ministerial functions and that section 2-201 applies to exercises of discretion and policy determinations. However, the parties dispute which section controls the outcome of this case. See *Kevin's Towing, Inc. v. Thomas*, 351 Ill. App. 3d 540, 547 (2004) (while the negligent performance of discretionary duties cannot subject a municipality to tort liability, the negligent performance of ministerial duties can); see also *Hanley v. City of Chicago*, 343 Ill. App. 3d 49, 56 (2003) (the discretionary immunity under section 2-201 immunizes against liability for both negligence and willful and wanton misconduct).

¶ 37    Plaintiff argues that the duty to maintain property under section 3-102 rendered the College's handling of the sidewalk deviation a ministerial function. See *Hanley*, 343 Ill. App. 3d at 56 (to maintain property is to keep it in a state of repair, and a repair is generally considered a ministerial act for which a defendant may be liable if negligently performed); see also *Kennell v. Clayton Township*, 239 Ill. App. 3d 634, 639 (1992) (it has been recognized that it is part of the ministerial duty of a municipality to keep its streets and sidewalks in a reasonably safe condition for public travel). Assuming that the College's handling of the sidewalk deviation was a ministerial function under section 3-102, plaintiff argues that there is a question of material fact as to whether the College exercised ordinary care in repairing it in a reasonable amount of time after learning of the deviation.

¶ 38    Plaintiff points out that there is a question of material fact as to when Benton reported the sidewalk deviation, which the trial court recognized. Benton was not sure when or to whom she reported the sidewalk deviation. In her deposition, she stated that she thought Stephenson was the foreman when she called, and Stephenson was replaced by Kornsey in June 2008. Benton further stated that she might have called to report the defect as early as 2007. Putting these two statements together, plaintiff argues that there is circumstantial evidence supporting the assertion that the College had notice of the sidewalk deviation as early as 2007, which raises a question of material fact as to whether the College exercised ordinary care by not repairing it until 2010. Given this issue of material fact, plaintiff argues, the trial court erred by granting summary judgment in favor of the College.

¶ 39    The College argues that Kornsey's handling of the sidewalk deviation involved both policy and discretion, meaning that it is entitled to the discretionary immunity afforded under section 2-201. See *Trtanj*, 379 Ill. App. 3d at 803 (in order to be entitled to immunity under section 2-201, the public entity must show that its act was both an exercise of discretion and a policy determination, as opposed to ministerial); see also *Courson v. Danville School District No. 118*, 301 Ill. App. 3d 752, 757 (1998) (not every discretionary action taken by a public employee is immunized by section 2-201; only acts or omissions in determining policy are immunized).

¶ 40    Beginning with the "policy determination" requirement, the term has been defined as a decision that requires the public entity to balance competing interests and to make a judgment call as to what solution will best serve each of those interests. *Trtanj*, 379 Ill. App. 3d at 803; see also *Wrobel v. City of Chicago*, 318 Ill. App. 3d 390, 394 (2000) (policy determination is one requiring considered evaluation and judgment by a certain entity, utilizing its own particular expertise, to formulate principles and procedures directed toward the achievement of common and general goals for the community's benefit during which several factors, including the public benefit, the practicability of the plan or procedure, and the best methods to be employed considering available resources, costs, and safety, must be considered). The trial court found that there was no question of material fact that the College determined policy in handling sidewalk deviations, and we agree.

¶ 41    The deposition testimony of Kornsey, Gieschen, and Schacht revealed that sidewalk deviations occurred on the College campus as a result of the freezing-and-thawing process during the winter. The College's policy for handling such deviations included three levels of approach: first, placing orange cones to alert individuals to the deviation; second, applying yellow paint; and third, physically altering the sidewalk, if necessary. Because slabs of concrete continue to shift and sometimes cure themselves, and also because a premature physical correction could backfire when a slab shifts again, Kornsey's policy was to use a wait-and-see approach to determine the level of correction required, if any. Consistent with the definition of a policy determination, Kornsey made a judgment call as to the handling of each sidewalk deviation, including the one at issue here. In this case, Kornsey placed orange cones at the site of the deviation, applied yellow paint, which was present when plaintiff fell in March 2009, and then physically altered or "planed down" the sidewalk sometime before March 26, 2010. Therefore, we agree with the trial court that there is no issue of material fact as to the "policy determination" requirement of section 2-201.

¶ 42    Next, we consider whether the handling of the sidewalk deviation was a discretionary or a ministerial function. Whether acts are classified as discretionary or ministerial must be determined on a case-by-case basis. *Hanley*, 343 Ill. App. 3d at 57. In other words, "[d]epending on the circumstances of a particular case, an act which might be considered a repair can be a discretionary matter." *Id.*; see also *Trtanj*, 379 Ill. App. 3d at 804 (the classification of acts as either discretionary or ministerial escapes any precise formulation and must be made on a case-by-case basis in light of the particular facts and circumstances presented).

¶ 43    In differentiating the concepts of discretionary and ministerial, "[d]iscretionary acts involve the exercise of personal deliberation and judgment in deciding whether to perform a particular act or how and in what manner that act should be performed." *Trtanj*, 379 Ill. App. 3d at 803. "Discretionary acts are 'those which are unique to a particular public office,' whereas ministerial acts are 'those which a person performs on a given state of facts in a prescribed manner, in obedience to the mandate of legal authority, and without reference to the official's discretion as to the propriety of the act.' " *Kevin's Towing, Inc.*, 351 Ill. App. 3d at 547 (quoting *Snyder v. Curran Township*, 167 Ill. 2d 466, 474 (1995)).

- 9 -

¶ 44        Given the facts in this case, we determine that the handling of the sidewalk deviation was a discretionary act and not a ministerial one. In his deposition, Kornsey testified that he alone made the final determination regarding the handling of each sidewalk deviation; he had unfettered discretion. Kornsey possessed the unique role of assessing each sidewalk situation individually before determining how best to proceed, and there was no set of rules or regulations that he was bound to follow. For example, Kornsey testified that there was no certain deviation measurement or demarcation that warranted repair; Kornsey had the discretion to do nothing at all. Similarly, although repairs were not usually made in the winter due to the random, continual movement of the slabs of concrete, Kornsey had the discretion to make a repair during the freeze-and-thaw season if the deviation was abnormally dangerous. Kornsey explained that he made a "per-case" decision or judgment call depending on the height, timing, and location of the deviation.

¶ 45        In this case, Kornsey explained that the sidewalk was not physically repaired immediately after plaintiff fell in March 2009, because it was still winter and the freeze-and-thaw season was not yet over. After the thaw but prior to the following winter, Kornsey followed up on the sidewalk deviation to see if further movement of the concrete slabs had occurred. Because the raised concrete slab did not lower back down, Kornsey made the decision to physically alter the sidewalk, and this was completed by March 2010. Given that discretionary acts are those that are unique to a particular office and involve the exercise of personal deliberation and judgment in deciding whether or how they should be performed, Kornsey exercised discretion in handling this sidewalk deviation.

¶ 46        The case at bar stands in contrast to cases in which mandatory compliance with certain regulations or statutes rendered the acts ministerial. Whereas Kornsey possessed absolute discretion to resolve each sidewalk issue, cases in which the public entity was *not* entitled to discretionary immunity lacked that type of employee discretion. See *Snyder*, 167 Ill. 2d at 470-72 (the township's placement of a warning sign was a ministerial act and not discretionary, due to the applicable regulations and statutes that controlled the sign's placement); *Trtanj*, 379 Ill. App. 3d at 804-05 (no discretionary immunity for the municipality's delay in hooking up a bypass pump, because the operation of a sewage system was subject to statutory and regulatory guidelines); *Anderson*, 317 Ill. App. 3d at 1114-16 (because the advisory circular provided regulatory guidelines for the runway safety area of the airport, the municipal defendants were not entitled to discretionary immunity under section 2-201).

¶ 47        As a final matter, the three cases relied upon by plaintiff are distinguishable. First, in *Gustein v. City of Evanston*, 402 Ill. App. 3d 610, 611 (2010), the plaintiff alleged that she fell and suffered injuries due to the city's negligent maintenance of an unimproved alley behind the plaintiff's home. The court determined that the city was not entitled to discretionary immunity under section 2-201 because: (1) the city had established a program of annually regrading all its unimproved alleys, which merely involved the execution of a set task (*i.e.*, a ministerial act); (2) once the alderman had put the plaintiff's alley on the priority list for repair, the city supervisor no longer had discretion to decide whether to allocate city resources for the alley's repair; and (3) the city failed to meet its burden of showing why it was entitled to immunity,

because there was no evidence showing that *any* work was done in the alley, let alone *how* it was done. *Id*. at 625-26. According to the court, had the city presented evidence at trial that the city supervisor had in fact repaired the depressions by regrading the alley, then the court would have been presented with the question of whether the supervisor exercised discretion in choosing which materials to use in the regrading. *Id*. at 628. However, no such evidence was presented at trial. *Id*.

¶ 48　　Second, in *Cole v. City of East Peoria*, 201 Ill. App. 3d 756, 762 (1990), the city did not claim discretionary immunity under section 2-201, and there was evidence that the city had become aware that the type of sewer grates used did not meet then-existing standards.

¶ 49　　Third, in *Horton v. City of Ottawa*, 40 Ill. App. 3d 544, 546 (1976), the plaintiff was thrown from his motorcycle after striking a large pothole in a city street. Apparently, the city had placed gravel in the pothole, but the gravel repeatedly washed out when it rained. *Id*. at 548. While the court found that the city was not entitled to discretionary immunity under section 2-201, there was no discussion of discretionary versus ministerial acts or the procedure for filling potholes. *Cf. Hanley*, 343 Ill. App. 3d at 58 (distinguishing that, if the repair of the pothole was done pursuant to a set procedure with no room for discretionary decisions, it was a ministerial act; but if the workers used their own judgment in performing the repair, it was a discretionary act). Moreover, a case after *Horton* that also concerned a repaired pothole reached the opposite result. See *Wrobel*, 318 Ill. App. 3d at 395-96 (determining that the city was entitled to discretionary immunity under section 2-201 because the sufficient amount of asphalt and moisture removed from the potholes was left to the personal judgment and discretion of the workers, and it was a matter of policy to efficiently prepare the potholes for repair in a particular area).

¶ 50　　Unlike in the cases relied on by plaintiff, Kornsey engaged in both the determination of policy and the exercise of discretion in handling this sidewalk deviation. Therefore, the College was entitled to discretionary immunity under sections 2-109 and 2-201, and the court properly granted summary judgment in its favor on that basis.

¶ 51　　　　　　　　　　　　　　III. CONCLUSION

¶ 52　　For the reasons stated, we affirm the judgment of the Du Page County circuit court.

¶ 53　　Affirmed.