2024 IL App (1st) 231481

FOURTH DIVISION
Order filed: June 27, 2024

No. 1-23-1481

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| MICHAEL WILLIAMS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellant, | ) | Cook County. |
| | ) | |
| v. | ) | No. 20 L 11929 |
| | ) | |
| VILLAGE OF BERKELEY, an Illinois Municipal | ) | |
| Corporation, | ) | Honorable |
| | ) | Karen L. O'Malley, |
| Defendant-Appellee. | ) | Judge, presiding. |

_____

JUSTICE HOFFMAN delivered the judgment of the court, with opinion.
Presiding Justice Rochford and Justice Ocasio concurred in the judgment and opinion.

**OPINION**

¶ 1    Appellant Michael Williams appeals two circuit court orders in his premises-liability suit against appellee the Village of Berkeley ("the Village"). In the first order, the court granted the Village's motion to reconsider a prior order denying the Village's motion for summary judgment, and in the second order the court found that the Village was immune from suit and granted summary judgment in favor of the Village on both of Williams' claims. Because the circuit court erred in concluding that the Village has established its entitlement to immunity, we reverse.

¶ 2    In November 2020, Williams filed suit against the Village, raising two premises-liability claims concerning the Village's failure to maintain a parkway tree. Williams alleged that a large branch from a Village-owned tree outside his home at 1244 N. Lind Avenue broke free and fell on him while he was walking his dogs, injuring him and killing one of his dogs. In the operative amended complaint, Williams' first claim alleged that the Village negligently allowed the tree to become and remain in a dangerous condition, and his second claim alleged that the Village's conduct in allowing the dangerous condition to exist was willful and wanton. The Village answered the amended complaint and raised three affirmative defenses, which included claims of governmental immunity under sections 2-109, 2-201, 3-102, and 3-105 of the Local Governmental and Governmental Employees Tort Immunity Act ("Immunity Act") (745 ILCS 10/2-109, 2-201, 3-102, 3-105 (West 2020)). The parties conducted discovery and took several depositions, which included the following relevant testimony.

¶ 3    Williams testified that he lives at 1244 N. Lind Avenue in Berkeley, Illinois, and has resided there since 1996. According to Williams, a different large branch fell from the tree at issue in July 2018, which he reported to police. Two or three days later, a worker from the Village's public works department came to remove the fallen branch. Williams testified that he had a conversation with the worker, during which the worker looked up at the tree and remarked, "Oh, yeah, this thing is rotten. It has to come down. It has to be cut down." Over the course of the next year and a half, Williams stated that on four or five occasions he happened upon unnamed public works employees on the street, asked about the status of the tree removal, and was told each time that "they [were] going to get to it. They knew about it, and they [were] running behind." Williams also stated that he once phoned Village Hall to inquire about the tree removal and was told by an

unspecified employee that the public works manager was not in the office but that the employee would relay the message to him. Williams testified that at some point in 2019 a company came to his street to cut down two parkway trees on the other side of the road. After the company was done, Williams spoke with a worker from the Village's public works department who was helping to clean up. Williams asked the employee whether they were also going to cut down the tree at issue, and the worker told him that "that they [were] going to get to it. They're just running behind." According to Williams, the tree had leaves during the summer of 2019.

¶ 4    On Saturday, January 11, 2020, Williams was walking his two dogs on the sidewalk outside of his house when he heard a cracking sound. He was then hit by a large branch that had broken off of the parkway tree at issue. The branch also hit one of his dogs, killing her. Williams alleged that, as a result of the accident, he sustained a concussion and injuries to his neck, left shoulder, left arm, left side, left leg, and back.

¶ 5    Williams' wife, Narvellia, testified that in July 2018 Williams called the Village about the first fallen branch, but she was not aware of any other discussions with the Village about the tree.

¶ 6    Joseph Wagner testified that he is the superintendent of the Village's public works department and has served in that role since 2016. One of his duties as superintendent is to oversee tree maintenance and to serve as the Village's forester. When he was first hired by the Village as a public works laborer in 2004, Wagner took a course from the Morton Arboretum on general tree maintenance and identification. Wagner also explained that, while working as a laborer, he received on-the-job forestry education from the then-superintendent, Robert Larem, who was a "forestry professional" and ran a forestry business. According to Wagner, each of the five workers

he employs have taken the same course from the arboretum, and any that worked under Larem would have learned from him as well.

¶ 7     Wagner explained that, when he began working as superintendent in 2016, he created a system in which the town was divided into six zones, or "quadrants," and his department would focus on trimming one quadrant at a time. According to Wagner, municipalities typically try to trim a given tree every four years, but, for practical reasons, namely the town's "footprint" and "the ease of us kind of traveling through space," he has found it difficult to maintain that schedule. Wagner testified that Williams' street, N. Lind Ave., is in quadrant two and, prior to the incident in question, was last inspected and trimmed as part of the normal maintenance rotation in 2017. As they are trimming trees, Wagner and his crew will conduct tree inspections, which consists of looking for cracks and separation in limbs, imbalances in the tree, small branches with heavy leaf growth, insect damage, and limbs invading homes, driveways, or the street. If a worker identifies a tree that may need to be cut down, Wagner will often personally visit the tree to confirm the worker's report, and the final decision regarding whether to cut down a tree rests with Wagner. If a tree is going to be removed in-house by the public works department, Wagner has sole discretion regarding the decision to remove the tree. If the removal requires hiring an outside contractor at a cost of more than $20,000, he must obtain Village Board approval. When asked whether the Village has any policies regarding tree removal, Wagner stated that he was not aware of any written policies, and that trees are evaluated on a case-by-case basis. Wagner added that the Village generally does not remove live trees, but will consider factors such as danger and anesthetics, as well as alternatives to removing the tree.

¶ 8 Wagner also testified that he conducts "cursory" inspections of trees as he drives around town performing monthly water meter readings. While conducting these readings, Wagner drives around slowly, giving him an opportunity to observe and note trees that are "obviously dead or dying" or trees that have broken branches. He keeps a running written log of trees that need to be trimmed or removed, but once a tree has been addressed it is removed from the list, and the Village does not keep any written records of what trees are trimmed and when.

¶ 9 Wagner testified that citizens will often request tree-related actions through a "contact us" page on the Village's website, by phoning or visiting Village Hall, or by notifying police. In such cases, public-works-related complaints or requests are forwarded to Wagner. When a citizen calls Wagner directly and either speaks with him or leaves a voicemail message, Wagner will note the call in a log and record the date, time, topic, caller's phone number, caller's name, and the information discussed during the call or in the message. If a citizen presents a complaint or request to another public works employee, the employee is supposed to instruct the citizen to contact the Village. Wagner explained that his workers are often engaged in dangerous tasks when approached by citizens, and he wants them to focus on their work. Citizens are not allowed to trim or cut down parkway trees on their own, but rather must go through the Village to have them removed.

¶ 10 Wagner testified that, according to his records, he received two calls from Williams, "one referencing a tree branch that had fallen down the block in the 1300 block of Lind, not at his residence," and one asking why the Village no longer cleared snow from the sidewalks. According to his records, Wagner had not received any emails from Williams. Wagner did not recall having any conversations with Williams while around town, nor did he recall receiving any reports from police on July 2, 2018, regarding a fallen branch at 1244 N. Lind Ave.

¶ 11    On January 13, 2020, after the incident in question, Wagner prepared a report for the Village's risk management company, IRMA ("the IRMA Report"), detailing "what had occurred from the perspective of the Public Works Department." In the report, Wagner stated, in relevant part, that the town had experienced gusty winds, rain, and sleet on January 10 and 11, 2020, including "sustained wind gusts of 50 mph." Wagner noted that "[r]eports from the scene suggested that the limb fell due to high winds." Public works staff, whom Wagner identified in his deposition as Carl Polaski and Tim Alund, were dispatched to the scene to remove the fallen limb. While there, Polaski and Alund were "approached by the homeowner asking if the tree would be removed." Wagner reported that the resident threatened legal action if the tree was not removed and complained that "he had called asking for the tree to be removed in the past." Wagner further noted, "[a]fter speaking with my staff at the scene, and an assessment of the tree, it was decided to remove the tree at that time. However, there is no record of previous requests regarding removal of the tree." Wagner also stated in the report that "[t]here were no previous indications that the tree was in distress of any kind" and that the tree had not shown any issues in previous wind storms. Wagner concluded the report by stating the following:

> "Similar maple trees exist on both sides of the street at Lind and Huron Avenues. On the south side of the street, two such trees were removed in October 2019 due to adverse health conditions. This corner was assessed in October before the removal of the two trees on the south side of the street because the removals were done by an independent contractor hired by the Village. At that time, the tree on the north side did not show signs for necessary removal."

During his deposition, Wagner expanded on the assessment of the other trees at that corner. He explained that the trees on the south side of Huron were being removed because they were too healthy and were overhanging a residence. Due to the proximity of the trees to the house, the Village hired an outside contractor to do the removal. "[B]ecause we're already going to have a contractor in the area doing removals, it makes sense to me to try and get more value out of the dollar when they're already set up in that space, *** so we went ahead and took a look at all of the trees in that vicinity." Wagner stated that he personally conducted that assessment, which included the trees in the parkway at 1244 N. Lind Ave. He did not see any indication that there was anything wrong with the tree at issue, and he did not see any external indication of internal rot or drying. If that were the case, he would have expected to see a lack of leaf growth, which was not present. According to Wagner, "[n]one of the trees on that corner were diseased and/or dying or dead. All were healthy."

¶ 12    Tim Alund testified that he is a water operator and laborer for the Village's public works department and has worked in that department since 2016. His forestry-related training consisted of the Morton Arboretum's basic forestry course. That course did not include any training on inspecting trees for diseases, rot, or dangerous conditions. Alund explained that when he inspects trees for the Village he only looks for basic defects like broken or dead limbs. In addition to those basic inspection duties, he also removes, trims, and plants trees. When trimming or pruning trees, Alund testified that he and his fellow laborers are focused on cosmetic issues, primarily trimming suckers and low-hanging branches. They do not inspect the trees for diseases or rot, which they are not trained to do.

¶ 13    Alund remembered picking up a fallen limb from the subject tree in 2018, and he was sure that he or another public works laborer "touched" the tree when they were working in that quadrant in 2017, but he did not notice anything wrong with the tree that needed to be addressed. Rather, he observed it to be "green" and "healthy." When he picked up the fallen limb in 2018, Alund did not inspect the tree because they had a lot of storm damage to clean up around town and needed to keep moving. Alund remembered speaking with Williams while he was cutting up the branch. Williams asked him to be careful not to damage his bushes, but Williams did not ask him to remove the tree, nor did Williams ask him to remove the tree on any other occasion.

¶ 14    On January 11, 2020, Alund was dispatched to cut up and remove the limb that had fallen on Williams and Williams' dog. Alund testified that, after Williams threatened legal action if the tree was not removed, he called Wagner, who asked what the tree looked like. Alund told Wagner that the tree looked lopsided, with just one remaining limb, so Wagner instructed him to cut down the tree. Alund and another laborer removed the tree later that day.

¶ 15    On March 23, 2022, the Village filed a motion for summary judgment, asserting that it was immune from suit under sections 2-109 and 2-201 of the Immunity Act because the decision of whether and when to remove the subject tree was a matter of discretion. The Village also asserted that it was immune under section 3-105 because the limb was brought down by weather conditions. Following a response from Williams and a reply from the Village, the circuit court entered an order on April 3, 2023, denying the Village's motion. The court concluded that, as it relates to immunity under sections 2-109 and 2-201 for discretionary acts, Wagner's lack of knowledge of the tree's alleged defect precluded the necessary finding that he made a discretionary policy decision to not cut down the subject tree. Without knowledge of a defect, the court reasoned, there could not have

been an exercise of discretion regarding how to handle it. The court also found that Wagner's 2020 IRMA Report, in which Wagner stated that he had inspected the subject tree in 2019 and saw no need to remove it, was "insufficient to demonstrate any sort of active deliberation at the time the decision was made." The court applied the same reasoning to Williams' claims that various Village employees had stated that they intended to cut down the tree but were running behind: absent documentation of a decision-making process, the court explained, there was no proof of an exercise of discretion.

¶ 16     As for whether the Village had actual or constructive knowledge of an unsafe condition that would bar its entitlement to immunity under section 3-102, the court found that disputed issues of material fact regarding notice precluded summary judgment on that issue. Lastly, the court found that section 3-105, which immunizes governments for injuries caused by the effects of weather conditions on the use of sidewalks, was inapplicable because Williams had not alleged that the weather had affected the use of the sidewalk itself.

¶ 17     On April 25, 2023, the Village moved for reconsideration of the court's order denying its motion for summary judgment. The Village contended that Wagner's deposition testimony explaining his 2019 examination of the tree in question was sufficient to demonstrate a conscious decision regarding the tree and that the court had improperly made a credibility determination when it found that testimony insufficient in the absence of corroborating documentation. The Village similarly argued that the court erred in requiring documentation of Williams' alleged conversations with unnamed Village employees. Further, the Village asserted that the court misapplied section 3-102 by treating it as a separate basis for immunity. In his response to the

motion, Williams asserted that the Village had not alleged proper grounds for reconsideration. The Village then filed a reply.

¶ 18    At a hearing on July 28, 2023, the circuit court orally granted both the Village's motion to reconsider and the Village's motion for summary judgment. The court first noted that "[t]he basis for the motion to reconsider was essentially that the Court erred in its application of the law." The court then found that, after viewing the evidence "with a fresh set of eyes," Wagner had made a discretionary policy decision when, in 2019, he inspected the subject tree, weighed the condition of the tree and the costs of removal, and then chose to not cut down the tree. This appeal follows.

¶ 19    Williams raises five points of error on appeal. He contends (1) that the circuit court erred in granting the Village's motion for reconsideration, (2) that the circuit court erred in ruling that the immunity provided in sections 2-109 and 2-201 overrides the duty imposed in section 3-102, and that the record failed to establish the Village's entitlement to immunity under (3) sections 2-109 and 2-201, (4) section 3-102, and (5) section 3-106. We see merit to Williams' third argument and reverse on that issue.

¶ 20    First, we will briefly address Williams' argument that the circuit court erred in reconsidering its initial denial of the Village's motion for summary judgment. "The purpose of a motion to reconsider is to bring to a court's attention: (1) newly discovered evidence; (2) changes in the law; or (3) errors in the court's previous application of existing law." *State Farm Mutual Automobile Insurance Co. v. Progressive Northern Insurance Co.*, 2015 IL App (1st) 140447, ¶ 68. Williams contends that the Village's motion did not assert any of these grounds as the basis for reconsideration and instead improperly requested the court to reconsider the same facts and arguments. However, the Village did not just reargue the same points it raised in its initial motion.

Rather, as the circuit court found, "the basis for the motion to reconsider was essentially that the Court erred in its application of the law." Indeed, in its motion the Village properly pointed out alleged misapplications of law and argued that the court misinterpreted section 3-102 and misapplied several cases that the court had cited in its order. Therefore, the circuit court acted within its discretion in reconsidering its application of the law in its prior ruling. See *Hajicek v. Nauvoo Restoration, Inc.*, 2014 IL App (3d) 121013, ¶ 12 ("The decision whether to grant or deny a motion for reconsideration is reviewed for abuse of discretion.").

¶ 21    In his second issue, Williams asserts that the circuit court erred when it found that the immunity for discretionary policy decisions provided by section 2-201 of the Immunity Act supersedes the duty that section 3-102 imposes on governmental entities to maintain their property in a reasonably safe condition. The Village responds that the circuit court did not expressly rule on this issue in granting summary judgment and that this issue, therefore, should not be grounds for reversal. The Village appears to be correct that the court did not expressly address this issue. However, because Williams alleged liability under section 3-102, in order to grant summary judgment on the basis that the Village had proven its entitlement to immunity under section 2-201, the court must have necessarily found that section 2-201 applied to and superseded the duty imposed in section 3-102. Accordingly, we will address Williams' argument, which we find to be without merit.

¶ 22    The Immunity Act "protect[s] local public entities and public employees from liability arising from the operation of government." *Van Meter v. Darien Park District*, 207 Ill. 2d 359, 368 (2003). "The Tort Immunity Act grants only immunities and defenses; it does not create duties." *Village of Bloomingdale v. CDG Enterprises, Inc.*, 196 Ill. 2d 484, 490 (2001). " "Rather,

the Act merely codifies those duties existing at common law, to which the subsequently delineated immunities apply.' " *Id.* (quoting *Barnett v. Zion Park District*, 171 Ill. 2d 378, 386–88 (1996)). "Since the Act was enacted in derogation of the common law, it must be strictly construed." *Van Meter*, 207 Ill. 2d at 368 (citing *Snyder v. Curran Township,* 167 Ill. 2d 466, 477 (1995)). "Unless an immunity provision applies, municipalities are liable in tort to the same extent as private parties." *Id.* at 368–69.

¶ 23    The Village's immunity defense arises from two related sections of the Immunity Act. Section 2-109 of the Immunity Act provides that "[a] local public entity is not liable for an injury resulting from an act or omission of its employee where the employee is not liable." 745 ILCS 10/2-109 (West 2020). Separately, section 2-201 provides that, "[e]xcept as otherwise provided by Statute, a public employee serving in a position involving the determination of policy or the exercise of discretion is not liable for an injury resulting from his act or omission in determining policy when acting in the exercise of such discretion even though abused." *Id.* § 2-201. "Read together, these sections shield a municipality from liability for the discretionary acts or omissions of its employees." *Andrews v. Metropolitan Water Reclamation District of Greater Chicago*, 2019 IL 124283, ¶ 26.

¶ 24    Williams argues that the immunity provided by sections 2-109 and 2-201 is not absolute and should yield to other provisions of the Immunity Act, namely section 3-102. That statute provides:

"(a) Except as otherwise provided in this Article, a local public entity has the duty to exercise ordinary care to maintain its property in a reasonably safe condition for the use in the exercise of ordinary care of people whom the entity intended and permitted to use the

property in a manner in which and at such times as it was reasonably foreseeable that it would be used, and shall not be liable for injury unless it is proven that it has actual or constructive notice of the existence of such a condition that is not reasonably safe in reasonably adequate time prior to an injury to have taken measures to remedy or protect against such condition." 745 ILCS 10/3-102(a) (West 2020).

¶ 25    Williams contends that the more-specific provision of section 3-102(a) should take precedence over the more-general provisions of sections 2-109 and 2-201. For support, Williams cites Justice Thomas' special concurrence in *Monson v. City of Danville*, 2018 IL 122486, ¶ 54 (Thomas, J., specially concurring)) and asks that we follow the reasoning espoused therein. However, that is not something that we have the power to do, for the simple reason that the majority in that case reached the exact opposite conclusion on the issue, and the majority opinion is, of course, binding precedent.

¶ 26    Specifically, the *Monson* majority held that section 3-102(a) does not grant immunity to public entities but, rather, "merely codifies the common-law duty of a local public entity to maintain its property in a reasonably safe condition." *Monson v. City of Danville*, 2018 IL 122486, ¶ 24. "Because section 3-102(a) does not confer immunity, it cannot override or supersede the immunities set forth in sections 2-109 and 2-201. These sections simply do not conflict with each other. Therefore, the principle that a specific immunity provision prevails over a general immunity provision is inapplicable." *Id.* ¶ 25. Accordingly, the court ultimately concluded that, "[u]nder the plain language of the Act, a negligence claim based on a municipality's violation of the duty to maintain its property can be subject to discretionary immunity under section 2-201, depending on the facts in the case." *Id.* ¶ 26. Therefore, because it is directly contrary to the binding majority

ruling in *Monson*, Williams' argument that section 2-201 should yield to section 3-102(a) is without merit.

¶ 27 We do, however, see merit to Williams' third argument, that the Village failed to demonstrate its entitlement to immunity under sections 2-109 and 2-201. A motion for summary judgment may be granted where the "pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2-1005(c) (West 2022). "The purpose of summary judgment is not to try a question of fact but, rather, to determine whether a genuine issue of material fact exists." *Lewis v. Lead Industries Ass'n*, 2020 IL 124107, ¶ 14 (citing *Williams v. Manchester*, 228 Ill. 2d 404, 417 (2008)). "In determining whether a genuine issue as to any material fact exists, a court must construe the pleadings, depositions, admissions, and affidavits strictly against the movant and liberally in favor of the opponent." *Id.* ¶ 15. "A genuine issue of material fact precluding summary judgment exists where the material facts are disputed or, if the material facts are undisputed, reasonable persons might draw different inferences from the undisputed facts." *Id.* We review an order granting summary judgment *de novo*. *Id.*

¶ 28 In order to establish its entitlement to immunity under sections 2-109 and 2-201 for the acts or omissions of an employee, "[a] municipal defendant must establish that (1) the employee held either a position involving the determination of policy *or* a position involving the exercise of discretion and (2) the employee engaged in *both* the determination of policy *and* the exercise of discretion when performing the act or omission from which the plaintiff's injury resulted." (Emphases in original.) *Andrews*, 2019 IL 124283, ¶ 27. Williams asserts that the Village failed to prove both of these elements because it failed to show that a Village employee with the requisite

policy-making or discretionary authority engaged in the determination of policy and an exercise of discretion in deciding to not cut down the subject tree.

¶ 29    Before analyzing this issue, it is helpful to recount the two different stories that each side's witnesses have presented. Williams' story begins with the first branch falling in 2018, at which time Tim Alund allegedly told Williams that the tree was rotten and needed to be cut down. Williams subsequently asked several unnamed Village employees when the tree would be cut down and was told each time that "they [were] going to get to it. They knew about it, and they [were] running behind." Williams alleged that he received the same answer from a public works employee who was outside his home in 2019 when the outside contractor was removing trees from across the street. Thus, in Williams' account, the Village was aware of the dangerous condition of the tree and intended to cut it down but had other priorities to address first. The Village's story, on the other hand, reflects no knowledge of the alleged defect in the tree. Specifically, Alund did not notice any rot when he was cleaning up the initial fallen branch in 2018, and Wagner similarly observed the tree to be healthy when he inspected it in 2019.

¶ 30    First, we must determine which of the Village employees involved in this case "held either a position involving the determination of policy *or* a position involving the exercise of discretion" regarding the removal of parkway trees. (Emphasis in original.) *Andrews*, 2019 IL 124283, ¶ 27. There does not appear to be a genuine dispute regarding this issue. Wagner testified that, unless the removal would require hiring an outside contractor at a cost of more than $20,000, in which case he would need Village Board approval, he is the only person who can decide to have a parkway tree removed, and Williams has not pointed to any evidence to the contrary. Thus, the

Village is only entitled to immunity if Wagner himself made a determination of policy and an exercise of discretion in not having the subject tree removed.

¶ 31    "Policy determinations are defined as 'those decisions which require the municipality to balance competing interests and to make a judgment call as to what solution will best serve each of those interests.' " *Monson*, 2018 IL 122486, ¶ 30 (quoting *Harinek v. 161 North Clark Street Ltd. Partnership*, 181 Ill. 2d 335, 341 (1998)). "Such interests may include safety, convenience, and cost." *Andrews*, 2019 IL 124283, ¶ 28 (citing *West v. Kirkham*, 147 Ill. 2d 1, 11 (1992)). "Exercises of discretion are those that are 'unique to a particular public office.' " *Id.* (quoting *Snyder v. Curran Township*, 167 Ill. 2d 466, 474 (1995)). An employee's act or omission will be deemed discretionary when it " 'involve[d] the exercise of personal deliberation and judgment in deciding whether to perform a particular act, or how and in what manner that act should be performed.' " *Monson*, 2018 IL 122486, ¶ 30 (quoting *Wrobel v. City of Chicago*, 318 Ill. App. 3d 390, 395 (2000)).

¶ 32    Further, and importantly for the present case, " '[d]iscretion connotes a conscious decision.' " *Id.* ¶ 33 (quoting *Corning v. East Oakland Township*, 283 Ill. App. 3d 765, 768, (1996)). "[A] public entity claiming immunity for an alleged failure to repair a defective condition must present sufficient evidence that it made a *conscious decision not to perform the repair*. The failure to do so is fatal to the claim." (Emphasis added.) *Id.* We will review three cases that demonstrate the application of this requirement.

¶ 33    In *Monson*, the plaintiff was injured when she tripped on a concrete sidewalk. 2018 IL 122486, ¶ 3. The City of Danville had recently conducted a sidewalk-repair program earlier in the year that had encompassed the portion of sidewalk at issue. *Id.* ¶ 34. During the repair program,

city employees walked the area and marked or noted sidewalks that needed to be repaired. *Id.* The employee responsible for the final determination regarding which slabs to repair, Doug Ahrens, testified that the repair decision depended on a "number of factors, including the cost and time allowed for the project, the condition of the concrete, nearby obstructions, and the path of travel for pedestrians." *Id.* Ahrens did not remember inspecting the portion of sidewalk that caused the plaintiff's injuries but testified that it "would have been included in his overall inspection." *Id.* Ahrens was unable to produce any documentation related to the slab at issue. *Id.*

¶ 34    The supreme court held that, standing alone, this evidence that the sidewalk on which the plaintiff had tripped had been included in the city's recent inspection was insufficient to demonstrate that Ahrens had exercised discretion in not repairing it. The court explained:

"Under the City's rationale, nearly every failure to maintain public property could be described as an exercise of discretion. In order to obtain absolute immunity, a city would only have to allege (i) it had a general policy or program to inspect its property for dangerous conditions, (ii) the defect at issue was included in the program, (iii) the defect at issue was not repaired, and (iv) thus, the city exercised discretion in deciding not to repair the defect. This reasoning expands the definition of discretionary immunity so broadly as to eliminate a city's duty to maintain its property." *Id.* ¶ 35.

The court further reasoned that the city needed to provide evidence of its decision-making process regarding the specific sidewalk defect at issue: "We do not know which factors were taken into account by the City in deciding not to repair the sidewalk," and, "*[m]ore importantly, we do not know whether anyone even took note of a sidewalk deviation at that location, or whether it was simply overlooked*." (Emphasis added.) *Id.* ¶ 38. Thus, without evidence that it was aware of the

defect and "that it made a conscious decision not to perform the repair" (*id.* ¶ 33), the city was not entitled to immunity.

¶ 35    In *Andrews*, a worker for a contractor hired by the defendant was injured when he fell from an allegedly dangerous ladder setup. 2019 IL 124283, ¶ 6. The defendant's resident engineer, Greg Florek, testified that he "walked the job site once or twice a day in order to check the progress and confirm that the work was being done in compliance with the contract." *Id.* ¶ 12. However, he had "nothing to do with" the safety aspects of the contractor's work, did not know when the dangerous ladder arrangement was put in place, did not recall seeing the ladders prior to the accident, and never inspected the ladders involved in the accident. *Id.* After reviewing its decision in *Monson*, the court summarized the applicable rule, stating, "a municipal defendant asserting immunity under section 2-201 must present evidence of a conscious decision by its employee pertaining to the conduct alleged to have caused the plaintiff's injuries. It follows that, *if the employee was totally unaware of a condition prior to the plaintiff being injured, he or she could not possibly have exercised discretion with respect to that condition.*" (Emphasis added.) *Id.* ¶ 34.

¶ 36    Citing *Monson* as precedent, the supreme court in *Andrews* held that the defendant's lack of awareness of the dangerous ladder configuration precluded immunity under section 2-201. *Id.* ¶ 35.

> "In this case, defendant has presented no evidence documenting a decision by its
> employees with respect to the condition involved in the accident. As the appellate court
> below held, the record contains no documentation of 'any decision or refusal to decide
> whether to use the ladder configuration that resulted in Andrews being injured—there was
> no decision-making process at all.' [*Andrews v. Metropolitan Water Reclamation District*

*of Greater Chicago*,] App (1st) 170336, ¶ 24, 435 Ill.Dec. 102, 138 N.E.3d 716. There is no evidence that Florek, defendant's resident engineer, exercised judgment or skill in making decisions about ladders or access platforms. Nor is there evidence that he balanced competing interests and made a determination as to what solution would best serve each of those interests. *Florek admitted in his deposition that he was totally unaware of the two-ladder setup that allegedly caused Andrews's injuries. Therefore, he was unable to weigh the risks and benefits and make a conscious decision with respect to the condition involved in the accident.*" (Emphasis added.) *Andrews*, 2019 IL 124283, ¶ 35.

¶ 37     In contrast is the case of *Richter v. College of Du Page*, 2013 IL App (2d) 130095, ¶ 4, in which a student filed a negligence suit against the College of Du Page after tripping on the sidewalk. The record showed that the manager of the buildings-and-grounds department, Chris Kornsey, had complete discretion regarding the handling of sidewalk deviations. *Id.* ¶ 19. Because the freeze-and-thaw process often caused sidewalk slabs to move, sometimes more than once, he often took a wait-and-see approach and repaired slabs in stages: "first, placing orange cones to alert individuals to the deviation; second, applying yellow paint; and third, physically altering the sidewalk, if necessary." *Id.* ¶ 41. For the slab at issue, "Kornsey placed orange cones at the site of the deviation, applied yellow paint, which was present when plaintiff fell in March 2009, and then physically altered or 'planed down' the sidewalk sometime before March 26, 2010." *Id.* The appellate court held that, because he "made a judgment call as to the handling" of the defect at issue (*id.*), Kornsey had exercised discretion and made a determination of policy entitled to immunity under section 2-201. *Id.* ¶ 50.

¶ 38    Applying these rulings to the present case, we believe that the Village failed to prove that Wagner made a discretionary policy determination when he decided to not cut down the subject tree. As *Andrews* and *Monson* make clear, in order to exercise discretion regarding the cause of an eventual injury, the employee must be aware of the defect or dangerous condition. See *Andrews*, 2019 IL 124283, ¶ 35 ("Florek admitted in his deposition that he was totally unaware of the two-ladder setup that allegedly caused Andrews's injuries. Therefore, he was unable to weigh the risks and benefits and make a conscious decision with respect to the condition involved in the accident."); *Monson*, 2018 IL 122486, ¶ 33 ("[A] public entity claiming immunity for an alleged failure to repair a defective condition must present sufficient evidence that it made a *conscious decision not to perform the repair.* The failure to do so is fatal to the claim." (Emphasis added.)). According to his testimony, Wagner was not aware of the rot that allegedly caused the limb to break and fall on Williams and his dog. Rather, he did not see any external indication of internal rot or drying, and he believed the tree to be healthy. Just as the municipality in *Monson* was held to have not made a conscious decision to not repair the injury-causing sidewalk when, despite having recently surveyed the area and the sidewalk in question, there was no evidence that the city was aware of the sidewalk defect and made a conscious decision not to make a repair, it cannot be said that Wagner made a conscious decision to not address the defect in the subject tree when, despite having inspected the tree, he was not aware of the injury-causing condition. Similarly, just as the defendant in *Andrews* was not entitled to immunity when its resident engineer had not observed the dangerous ladder setup despite walking the job site and inspecting the contractor's work daily, the Village is not entitled to immunity under sections 2-109 and 2-201 when Wagner had not observed the tree's rot during his recent inspection.

¶ 39     If Wagner had observed signs of rot and chosen not to address it for policy-related reasons, whether that be allocation of funds, allocation of personnel, disruption to the public, etc., then that would have been a conscious decision and an exercise of discretion. See *Richter*, 2013 IL App (2d) 130095, ¶ 41. But, in *Andrew*'s words, if Wagner was "totally unaware of [the] condition," in this case the tree's alleged rot, "prior to the plaintiff being injured, he *** could not possibly have exercised discretion with respect to that condition." *Andrews*, 2019 IL 124283, ¶ 34. There must be an awareness of the defect and a conscious decision not to address it for policy-related reasons before there can be a finding that discretion was exercised. In this case, the summary-judgment evidence does not reflect such a decision.

¶ 40     The Village argues that Wagner's mistaken inspection of the tree "is the essence of a judgment call shielded by section 2-201" and that it should not be punished just because Wagner is not a certified arborist and lacks the knowledge to make more-educated assessments of tree health. However, that argument ultimately goes to liability, not immunity. It may very well be true that it is not reasonable to expect municipalities to have every tree inspected by a certified arborist, and it may be the case that the Village and Wagner may have exercised reasonable care in the inspection and maintenance of the subject tree and that the Village is not liable for Williams' injuries, but that is not at issue in the present motion for summary judgment. All we are concerned with at this point is the issue of immunity, and the failure to observe and make an exercise of discretion regarding the defect in the tree precludes immunity under section 2-201.

¶ 41     We also do not agree with the Village's argument that Williams' testimony contains facts that can establish its immunity claim. Again, Williams testified that several unnamed Village employees told him on multiple occasions that the Village was "going to get to it. They knew about

it, and they [were] running behind." It is true that this testimony could reasonably suggest that the Village was aware of the defect, that someone with requisite decision-making authority had decided to cut down the tree, and that it had not yet happened for apparent policy reasons, i.e., the Village had other priorities to address first. See *Doyle v. Village of Tinley Park*, 2018 IL App (1st) 170357, ¶ 45 (holding that "village officials were engaged in ongoing policy determinations regarding the allocation of village funds and resources" and were entitled to immunity when the officials told the plaintiffs that they could not yet attend to the plaintiffs' known drainage issues because "the list of drainage complaints is more than we can accommodate and we do not have the manpower to complete the drainage complaints in a timely manner"). However, such a reading would require that inferences be drawn in the Village's favor, and at the summary-judgment stage we must strictly construe these allegations against the Village as the movant and liberally in favor of Williams as the nonmovant. When viewed through that lens, Williams' testimony lacks necessary specificity regarding to whom "they" refers, who made the decision to cut down the tree, whether that person held either a position involving the determination of policy or a position involving the exercise of discretion regarding the removal of parkway trees, and what policy decision caused the tree removal to be delayed. When construed against the Village, Williams' testimony is far too vague regarding these material facts to conclude that the Village is entitled to judgment as a matter of law.

¶ 42    Accordingly, because the summary judgment evidence fails to establish that a Village employee holding a position involving the determination of policy or the exercise of discretion was aware of the alleged defect in the tree at issue and made a conscious decision not to repair the

defect for policy-related reasons, the Village failed to prove its entitlement to immunity, and the circuit court erred in granting summary judgment in the Village's favor.

¶ 43    Before concluding, we will briefly address Williams's final two issues, neither of which is reviewable at this time. First, he argues that there exists a genuine issue of material fact regarding whether the Village fulfilled its duty under section 3-102 of maintaining the subject tree with reasonable care. However, this issue was not addressed below during the proceedings on the Village's motion for summary judgment. Rather, the circuit court focused solely on immunity and did not rule on this issue when it granted the Village's motion. It would be improper for us to do so first. See *Pepper Construction Co. v. Palmolive Tower Condominiums, LLC*, 2016 IL App (1st) 142754, ¶ 81 ("[O]ur function is to review rulings and judgments of the circuit courts and generally we will not pass on any question as to which the circuit court failed to make a decision." (citing *In re Marriage of Bennett,* 225 Ill. App. 3d 828, 830 (1992))).

¶ 44    Second, Williams contends that there exists a genuine issue of material fact regarding whether the Village is immune from suit under section 3-106 of the Immunity Act, which immunizes municipalities when "the liability is based on the existence of a condition of any public property intended or permitted to be used for recreational purposes." 745 ILCS 10/3-106 (West 2020). However, at no point has the Village claimed immunity under section 3-106. That defense has not been litigated below, and we will not address it for the first time on appeal.

¶ 45    For the foregoing reasons, we reverse the circuit court's order granting summary judgment in favor of the Village, and we remand for further proceedings.

¶ 46    Reversed and remanded.

---

*William Miller v. Village of Berkley* **2024 IL App (1st) 231481**

---

Appeal from the Circuit Court of Cook County. No. 20 L 11929,
Honorable Karen L. O'Malley, Judge, presiding.

---

Appellants:   Kenneth Lubinski, Morici, Longo & Associates
730 W. Randolph Street, 6th Floor
Chicago, IL 60661
Phone:  312.372.9600

Appellees:   R. Michael Hartigan
Hartigan & O'Connor, P.C.
53 W. Jackson Boulevard, Suite 460
Chicago, IL  60604
Phone:  312.235.8880